UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In the Matter of                                    CHAPTER 7

WILLIAM CHARLES BACE

    Debtor                                   Case No.:  05-42466-RDD

-------------------------------------------------------x

### DEBTOR'S MOTION FOR THE BANKRUPTCY COURT TO HOLD NEW YORK CITY MARSHAL JEFFREY S. ROSE, NEW YORK CITY DEPARTMENT OF FINANCE AND NEW YORK CITY POLICE DEPARTMENT IN CONTEMPT OF COURT FOR VIOLATION OF THE AUTOMATIC STAY AND DISCHARGE INJUNCTION AND A DETERMINATION AND ASSESSMENT OF APPROPRIATE SANCTIONS, TO DETERMINE THE CLAIMS OF DEPARTMENT OF FINANCE FOR PARKING FINES WHICH PREDATE MARCH 9, 2006 TO BE DISCHARGED AND/OR TO PERMIT DEBTOR TO AVOID ALL LIENS WHICH IMPAIR HIS EXEMPTIONS, AND TO AWARD DEBTOR COMPENSATION FOR DAMAGES SUFFERED AS WELL AS OTHER APPROPRIATE RELIEF

    William C. Bace, Debtor *pro se*, pursuant to Title 11 U.S.C. §101 *et. seq*. and the Federal Rules of Bankruptcy Procedure, respectfully moves this Court to hold City Marshal Jeffrey S. Rose, New York City Department of Finance and New York City Police Department in Contempt of Court for willful and flagrant disregard for and the violations of this Court's Orders of Automatic Stay and Discharge Injunction and to assess appropriate sanctions against them, jointly and severally.

    Further, the Debtor requests this Court to determine and award Debtor compensatory damages resulting from the willful and wrongful acts of City Marshal Jeffrey S. Rose, the New York City Department of Finance, and New York City Police Department, to determine that the Chapter 7 Discharge of Debts granted to Debtor on May 9, 2009 discharged any and all claims of the Department of Finance arising on or before March 9, 2006, or in the alternative to permit Debtor's election to avoid the

1

judicial lien/liens created by levy of said judgment/ judgments and impounding the Debtor's vehicle, and other appropriate relief, and for cause states as follows:

## **Jurisdiction and Venue**

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §1334 and §157(b), and 11 U.S.C. §§105, 524, and 727. This is a core proceeding under 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Preliminary Statement**

The Honorable Thomas F. Lotti, of the Village Courts of Nassau County, took advantage of an opportunity presented during his deliberations in *State v. Ventura* to wax a bit poetic:

> "Every legal decision is interpretive and every judge who writes a decision is interpreting. The common law is interpreted from the customs and practices of a society. The common law does not remain static anymore than society does. A judge writing a decision does not necessarily do so as a pure reflection of tradition, but may be in a position where a novel question is presented and where society through its customs and practices has not presented a clear solution to the problem. The judge, while a member of society, is compelled to find a legal answer to a legal question. Of necessity, the problem may have to be analyzed from a historic and public policy standpoint. As such, the legal answer may be a reflection of existing policies, mores, customs and practices or it may attempt to find a legal solution by considering a number of issues instead of a narrow one as presented. The diversion from the narrow question presented into the realm of philosophy, history and public policy is often referred to as dicta. However the dicta may explain the rationale for the decision with histories, references, metaphors and analogs." May 6, 2004.

Approximately twenty (20) years ago, by the acts of the New York State Legislature, the nature and processing of violations of street parking infractions in cities with populations of one million persons or more was markedly changed. In order to relieve unnecessary stress upon both the trial courts which, heretofore, were charged with the adjudication of parking violations as well as upon the person charged

therewith, Parking Violation Bureaus were created by amendment to Article 2-B of the Vehicle and Traffic Law (§§235-244). In New York City, the Parking Violations Bureau (PVB) became a part of the NYC Department of Finance (DOF) and under the direction of the Commissioner of Finance.

The statutory provisions relating to the Parking Violations Bureau in New York City are set forth in Article 2-B and Chapter 39 of Title 19 of the Rules of the city of New York. Despite the clear language of the statutes and the express will and direction of the New York State Legislature, and, as will be shown infra, the express interpretation and directions of the Comptroller of New York State, and the opinions and determinations of several federal and state courts, the DOF has for twenty (20) years successfully institutionalized a policy of "Don't Ask, Don't Tell," thereby unlawfully charging and collecting fines, penalties, and interest for untold claims which were discharged as the result of Orders of Discharge granted by the United States Bankruptcy Court in Chapter 7 proceedings.

This motion provides this Court an opportunity, or, rather, this motion *requires* this Court to interpret and implement a twenty-year–old legislative enactment, put an end to the Department of Finance's utter disregard for and violation of the rights of debtors discharged pursuant to Chapter 7 Orders of Discharge, and send a clear message to the Commissioner of the Department of Finance that "civil" means civil.

## Statement of Facts

The Debtor filed for bankruptcy protection under the provisions of Chapter 13 of Title 11 United States Code on October 16, 2005.  (Docket No. 1) Debtor's petition for bankruptcy was converted to a Chapter 7 proceeding by the Bankruptcy Court on March 9, 2006 (Docket No. 13), and Roy Babitt, Esquire was appointed Chapter 7 Trustee by the Court on March 13, 2006. (Docket No. 18)

The Debtor was granted a Chapter 7 Discharge pursuant to 11 U.S.C. §727 on May 9, 2009.  (Docket No. 249).

On October 16, 2005, at the time of his filing the Chapter 13 Petition, Debtor prepared and filed Schedule C "Property Claimed as Exempt," along with other required schedules and matrixes.  (Docket No. 1) The Debtor claimed an exemption

for his 1992 Subaru on Schedule C; however, Debtor mistakenly cited the Federal Bankruptcy statutes for the property Debtor claimed as exempt.

Debtor learned subsequently that New York is an "opt-out" state, and Debtor's exemptions are regulated by NY State statutes. Following the conversion of the Debtor's petition to a proceeding under chapter 7, Debtor prepared and filed an amended Schedule C "Property Claimed as Exempt" on May 2, 2006. (Docket No. 38)

Debtor did not include a claim to exempt the 1992 Subaru on the Amended Schedule C because the 1992 Subaru was not in Debtor's possession at that time, and due to his unfamiliarity with the intricacies and nuances of Title 11, he was unaware of the strategic importance preserving his claim to exempt the Subaru may later bear on these proceedings.

The Debtor's schedules of debts filed along with the Chapter 13 petition included an unsecured debt for parking fines, and the DOF filed a formal Proof of Claim for payment of "parking fines and penalties" against Debtor's Chapter 7 estate on or May 30, 2006, which was subsequently amended by the DOF on October 7, 2008.

To the best of Debtor's knowledge and recollection at this time, Debtor believes that his 1992 Subaru was impounded four (4) times during the period December 2005 through April 2006 which Debtor contends violated the automatic stay pursuant to 11 U.S.C. § 362 (a).

On or about December 13, 2005 Debtor's Subaru was wrongfully impounded, purportedly by the NYPD, and Debtor was deprived of its use until Debtor was able to document the pending bankruptcy proceeding to the DOF and secure its release and return approximately three (3) days later. Debtor is currently investigating the circumstances of this event, and will provide additional details to the Court and opposing counsel upon his receipt.

On January 6, 2006, Debtor's Subaru was again wrongfully impounded, on this occasion by City Marshal Jeffrey S. Rose at the direction of the Department of Finance, in willful and flagrant disregard of the Order of this Court and the automatic stay imposed under the provisions of Section 362 (a). After expending significant

time and effort, the Debtor was able to secure the release of the 1992 Subaru from the DOF and City Marshal Rose on or about January 24, 2006.

Pursuant to Debtor's request to the DOF to provide information and all documentation pertaining to Debtor's Subaru, Debtor received the document dated July 23, 2009, which is attached as ***Debtor's Exhibit A***. The DOF has already admitted that its agents impounded the Debtor's Subaru on December 13, 2005, and again on January 6, 2006; however, DOF disputes Debtor's allegation that his car was impounded a total of four (4) times during this period.

An odd, fleeting and incomplete memory has been nagging Debtor for the last year, but until recently, Debtor has been unable to find anything to confirm this memory. Having almost convinced himself that his mind was perhaps playing tricks, an innocuous entry reflected on Exhibit A reassured Debtor that he wasn't dreaming, and provided the confirmation Debtor sought.

Debtor recalls that on January 23, 2006 he had spent most of the afternoon at 66 John Street presenting documentation of the pending Chapter 13 proceeding to the DOF's staff attorneys. At length, Debtor was provided a letter to deliver to City Marshal Rose directing him to release Debtor's Subaru from his impound and return it to Debtor waiving all charges. Being late in the day, Debtor decided he would deliver the DOF's release to City Marshal Rose the following day; whereupon Debtor returned to his apartment exhausted after a grueling day.

City Marshal Rose's offices are located in Sheepshead Bay, Brooklyn - two (2) subway trains and one-and-a-half hours are required to get there from 66 John Street. On January 24, 2006, Marshal Rose's consent for the release of Debtor's Subaru was quickly obtained - he reviewed DOF's letter and provided Debtor with a letter of release for the impound lot. Travel to the impound lot, located near the Battery Tunnel, however, would require another 30 minutes and $20.00 car service - or 90 minutes and two buses - to actually redeem the vehicle[1]. (Debtor chose the car

---

[1] Debtor may also have paid a toll, if one is required, to enter the Battery Tunnel from Brooklyn to return to his apartment in NYC. Debtor will explore in which direction the toll is collected for the Battery Tunnel and inform the Court at the hearing on damages.

service.)

The entry on Debtor's Exhibit A which refreshed Debtor's memory refer to the dates 1/30/2006 and 1/31/2006 toward the bottom on the right side above the box. The significance of these dates for Debtor is that on an occasion after Debtor's Subaru was returned by DOF and the Marshal, Debtor returned to his apartment and legally parked his car a block away from his apartment. That very night, Debtor's Subaru was again towed and impounded by the same marshal who returned it to Debtor only a few hours earlier.

Debtor alleges that it was City Marshal Rose who impounded the Debtor's Subaru in violation of the automatic stay on January 6, 2006, who returned the vehicle to Debtor on January 24th, who then wrongfully impounded the debtor's vehicle a few hours later, during the evening/early morning hours of January 24/25. Debtor didn't have any problem, this time, securing DOF's instructions for the release of Debtor's Subaru from impound. But he was required, once again, to waste the better part of the day on January 30th and another $25+ for subway and car service. Debtor hopes that further efforts will provide additional documentation to verify his recollections and fill in some of the gaps.

Debtor's fourth and final claim of the violation of the automatic stay occurred sometime around the 1st of March, 2006, when the DOF claims it was agents of the NYPD who impounded Debtor's Subaru and towed his vehicle to the NYPD storage facility at Pier 78, West 38th Street at West Side Highway. Unfortunately, Debtor doesn't have any records pertaining to this event, and he is currently investigating the circumstances of the NYPD's actions regarding Debtor's Subaru. Debtor will provide them to the Court and opposing counsel upon his receipt. At this time, Debtor has been able to confirm that the Debtor's 1992 Subaru was sold at a public auction conducted by the NYPD on March 22, 2006 where it was sold for $475.00. NYS sales tax of $39.78 was also collected from the high bidder at that time. An Auction Bill of Sale documenting the sale and transfer of the Subaru was completed by the NYPD. Debtor has attached copies of documents recently received from the DMV pertaining to the March 22nd auction sale as ***Debtor's Exhibit B***.

Records from DMV (Exhibit B) reveal that the Debtor's driving privileges were suspended for a period of thirty (30) days – from May 15 to June 15, 2006 as the result of an "insurance lapse." After the Debtor's 1992 Subaru was impounded and sold, Debtor's automobile insurance was terminated; however, Debtor was unable to turn in his vehicle's license plates, as they were being held by the NYPD pending the auction sale and distribution of sale proceeds. The vehicle's license plates were returned, presumably by the NYPD, on May 15th at which time the Debtor's suspension commenced. The significance of refusal to return license plates of impounded vehicles is discussed more fully infra.

On May 21, 2009, the Debtor's 1997 Subaru was impounded and towed from its lawful parking space by City Marshal Rose pursuant to his levy and execution of the "parking fines" claimed by DOF as then due and owing, which the Debtor claims were discharged by virtue of the Discharge Order of May 9, 2009.

## **Violation of the Automatic Stay Pursuant to 11 U.S.C. § 362(a)**

11 U.S.C. § 362 (a) provides, in pertinent part:

> **Automatic stay**
> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of --
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;
>
> (4) any act to create, perfect, or enforce any lien against property of the estate;
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor
that arose before the commencement of the case under this title. . .

On Schedule F "Creditors Holding Unsecured Non-Priority Claims" filed by Debtor on October 16, 2005, the Debtor clearly listed a debt of $2,228.00 for "fines" owed to "NYC Parking Fines, P.O. Box 3670, N.Y. N.Y. 10008."

The New York City Department of Finance was duly served notice by the Clerk of the Bankruptcy Court of the Debtor's Chapter 13 petition and Notice of the Automatic Stay pursuant to 11 U.S.C. § 362 (a). The Court file contains the Certificate of Service of Bae Systems, dated October 25, 2005 (Document 3), in which Joseph Speetjens declared under the penalties of perjury: "The following entities were served by first class mail on October 27, 2005:  . . . . [creditor number] 4127986  New York City Department of Finance, Parking Summonses Collections, Church Street Station, P.O. Box 3670, New York  NY  10008-3670 . . ." ***Debtor's Exhibit C.***

Nonetheless, in direct violation of the automatic stay of §362(a), and having been served notice of the Debtor's pending bankruptcy proceedings, the NYPD, New York City Department of Finance/Parking Violations Bureau and its agents, servants and employees continued its collection efforts and failed to take all reasonable steps necessary to prevent NYPD, City Marshal Jeffery S. Rose (and all other persons or city agencies empowered and authorized to employ civil judgment collections powers to collect unpaid parking "fines and penalties" on its behalf) from pursuing independent efforts to collect from the Debtor the DOF's claims for parking fines which were assessed prior to the "filing date" of Debtor's petition – in this case, March 9, 2006, the date of the conversion of the proceedings to chapter 7.

In the Department of Finance's "Response of the Department of Finance of the City of New York in Opposition to Debtor's Motion and Debtor's Other Various Requests for Relief," (Docket No. 262), the Department of Finance admits that on at least two (2) occasions its actions violated the automatic stay provisions of §362. The DOF's statements do not go so far as to also directly admit that the NYPD and/or City Marshal Rose also violated the automatic stay; however, as the DOF's collection efforts are conducted through the actions of its agents, DOF's admissions of its violations must also admit the culpability of the NYPD and/or City Marshal Rose.

The DOF has already admitted that the impounding of Debtor's Subaru by the NYPD on December 13, 2005 and by City Marshal Rose on January 6, 2006 violated the automatic stay protections imposed by §362(a). While DOF maintains that the impounding by NYPD on December 13th was due to the Debtor's car being illegally parked (and a valid exercise of its police power?), the DOF fails to provide evidence that Debtor was charged with a parking offense on December 13, 2005. Debtor argues that if a parking violation was issued by the NYPD, the "parking violations bureau" should have a record of the violation, its disposition, and the payment or non-payment of any fine assessed. As the DOF's Proofs of Claim, Exhibits C & D, do not reflect a summons issued on December 13, 2005, the Debtor disputes the scenario presented by DOF for the December 13, 2005 impounding of Debtor's Subaru.

Similarly, there is no summons or fine listed by DOF for January 6, 2006, the date of City Marshal Rose's first levy of Defendant's Subaru. Debtor submits that no summons is listed because the Debtor's car was legally parked when Marshal Rose hitched it up to the back of his tow truck and shuffled off to Brooklyn.

In addition, Debtor alleges that Marshal Rose impounded the Debtor's legally parked vehicle sometime late January 24 or early January 25th, which was released to Debtor on January 30, 2006.

While the NYPD may not have received written notice from the Bankruptcy Clerk of the Debtor's pending chapter 13 proceeding, the Debtor's submission of acceptable "proof" of the pending bankruptcy proceedings to the NYPD and DOF in December 2005 secured the release and return of the impounded vehicle to the Debtor and clearly established that the DOF and NYPD had written notice of the pending bankruptcy proceedings at least as of December 16, 2005.

Despite the fact that the Parking Violations Bureau's release of the Debtor's vehicle in mid-December 2005 and again in January 2006 was a clear admission by the PVB that the Debtor's car was wrongfully seized and impounded by NYPD and Marshal Rose, no effort was made to mitigate its damages and return the Debtor's car to him by the NYPD, PVB or Marshal Rose. "What, are you crazy!" was essentially the response of the PVB and Marshal Rose's office staff when Debtor suggested that the equities seemed to be in Debtor's favor to require his car's return with no

additional inconvenience or expense incurred by Debtor. Instead, the ordeal of the trip to Marshal Rose's office and then to the impound lot, not including the time and expense Debtor had already incurred up to that point obtaining the release from the PVB at 66 John Street, would exact another $20+ out of pocket and a good three (3) hours of "sit and wait" travel time.

On each occasion the Debtor's vehicle was seized and impounded, Debtor, at personal cost, inconvenience and expense, in addition to his loss of use of said vehicle, was required to present his documentation of the pending Chapter 13 proceedings in person at the Parking Violations Bureau on John Street and then travel to the NYPD impound lot at Pier 76 or the office of City Marshal Rose and then on to the impound lot to regain possession of his vehicle. The release of his car without requiring any payment by Debtor on each of these occasions marks the specific admission by the DOF that Debtor's car was wrongfully seized and impounded.

In the "Response" of DOF previously filed in this matter (Docket No. 262), DOF, through its attorneys, as well as in the affidavits submitted by employees of DOF argue that DOF, its agents and employees should be excused for any violation of the automatic stay suggesting that its actions can be explained away as "an unfortunate confluence of circumstances" (Debtor's particular favorite), or a mere technical violation, or not that big a deal, or of relative short duration. While seemingly placing fault on a clerical or secretarial worker at the DOF, the DOF fails to mention that its violations didn't occur just once, but repeatedly, four (4) times in the course of four (4) months.

Sometime in late-February/early-March, 2006, the Debtor's vehicle was again removed from a lawful parking spot and seized and impounded this time by the New York City Police Department. On this occasion, however, Debtor was unable to obtain the release of his vehicle from the NYPD & Parking Violations Bureau, as the NYPD's agents at Pier 76 demanded that Debtor not only pay all of the charges accruing to it for their towing and storage, full payment for all outstanding fines claimed by DOF was also required to redeem the vehicle. The Debtor was unable to redeem his Subaru, and it was sold by the NYPD at auction on March 22, 2006. Debtor calls upon the NYPD and/or DOF to produce all written documentation

supporting the impounding of the vehicle, the auction sale, and the distribution of the proceeds of the sale.

The DOF cannot dispute having actual knowledge of and its receipt of written notice from the bankruptcy court clerk of the Debtor's newly-converted Chapter 7 proceedings, prior to the auction sale of the 1992 Subaru in March 2006. Again, the Court file contains the Certificate of Service of Bae Systems, dated March 19, 2006 (Document 22), **Exhibit D**, in which Joseph Speetjens declared under the penalties of perjury: "The following entities were served by first class mail on March 19, 2006:  . . . . [creditor number] 4127986  New York City Department of Finance, Parking Summonses Collections, Church Street Station, P.O. Box 3670, New York  NY 10008-3670 . . . ."

As Debtor did not have the funds to pay the total debt claimed by NYPD and DOF, he was unable to stop the DOF and NYPD from selling his 1992 Subaru.  In due course the said vehicle was sold by the NYPD on March 22, 2006. Debtor was later informed that on or about May 15, 2006, the vehicle's license plates were returned to the Department of Motor Vehicles.  The Debtor, however, has never been provided any information by the NYPD or the DOF of the details of the sale of his car: the sales price, the application of the sales proceeds, etc.

DOF would have this Court excuse the repeated violations of the automatic stay by DOF, City Marshal Rose, and Debtor assumes, the NYPD as the result of a clerical mistake, a minor consequence, and unworthy of this Court's time and consideration, much less the consideration of any damages Debtor may have suffered as a result.  Case law has long shown that such arguments are completely devoid of merit, and, Debtor submits, the mere submission of such baseless arguments call into question whether any of the DOF's arguments are made in good-faith.

As former U.S. Bankrutpcy Chief Judge Stephen Gerling wrote in *In re Schultz,* Case No. 07-64144 (N.D.N.Y. 2009):

> The law with regard to willful violations of the automatic stay in hthe Second Circuit was announced almost twenty years ago in the case of *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc.,(In re Crysen/Montenay Energy Co.), 902* F.2d 10898 (2nd Cir 1990).  That case instructs that "any deliberate act taken in

violation of the stay, which the violator knows to be in existence, justifies an award of actual damages." Id. at 1105. . . . . .

Bankruptcy courts have frequently wrestled with the question of a willful stay violation where the creditor's act is one of omission, as opposed to commission. . . . The Court is of the opinion that once a creditor has put the wheels of collection in motion against a judgment debtor, upon learning of the filing of a bankruptcy by that debtor, the creditor must insure that the wheels of collection come to an immediate halt. Insuring that will happen requires more than simply notifying various types of collectors, e.g., garnishees, sheriffs, marshal, employers and others. There must be some degree of reasonable follow-up whereby the creditor is assured that the collection activity has ceased. In a series of decisions, Chief U.S. Bankruptcy Judge Carla E. Craig of the Eastern District of New York, observing that Code 362(h) is liberally construed by the courts of the Second Circuit, noted in *In re Parry*, 328 B.R. 655, 658 (Bankr. E.D.N.Y. 2005) that "[if] §362(h) were limited to violators who had an actual intent to violate the stay, 'the deterrent effect of the damages remedy, and the relief it affords wronged debtors, would be compromised inappropriately,'" quoting from *In re Robinson*, 228 B.R. 75, 81 (Bankr. E.D.N.Y. 1998) . . . . . a creditor has an affirmative duty under Code §362 to take the necessary steps to discontinue its collection activities against a debtor.

Even assuming the first levy and impounding of Debtor's Subaru (on December 13, 2005) was due to a "clerical error," its *mea culpa* loses all sympathetic value when offered to explain the second and the third and the fourth levy and impounding of the Debtor's Subaru by City Marshal Rose, the DOF and the NYPD.

The Debtor's motion squarely places before this Court two (2) questions for determination: Did the actions of the NYPD, DOF and City Marshal Rose constitute a willful violation of §362 – the automatic stay, and if so, what actual damages did the Debtor suffer as the result.

Debtor submits that the evidence to be presented before the Court at a future hearing will clearly show that the NYPD, DOF and City Marshal Rose willfully violated the automatic stay provisions and that the Debtor suffered out-of-pocket damages, loss of use of his vehicle, as well as "emotional distress" for which Debtor seeks to be compensated.

On or about May 31, 2006, a Proof of Claim was filed on behalf of New York City Department of Finance, Parking Summons Collections, Church Street Station, P.O. Box 3670, New York NY 10008 in the amount of $3,800.98. A copy of the PVB's Proof of Claim was mailed to Debtor at the time of its filing. The PVB's Proof of Claim alleges an unsecured claim/judgment for the sum of the "fines and penalties" assessed against two vehicles previously owned by Debtor: the 1992 Subaru station wagon, plate number DJE5122 and a 1984 GMC "Jimmie," plate number 20119JJ. A copy of PVB's Proof of Claim is attached as *Debtor's Exhibit E*.

The Department of Finance's Proof of Claim was subsequently amended to total $4,123.46 on October 7, 2008, a copy of which is attached as *Debtor's Exhibit F*.

Neither Proofs of Claim, however, substantiate or evidence a claim of $3,800.98/ $4,123.46 for fines and penalties secured by judgment, as suggested and appearing from the manner in which the claim forms were completed and submitted for filing with the Bankruptcy Court. The supporting documents, which were attached to and in support of the DOF's Proofs of Claim, reveal not one (1) but **twenty-seven (27)** individual claims and/or judgments:

| Summons | Amount | Judgment | Last RES Act | Last PVB Act | |
|---|---|---|---|---|---|
| 1072465735 | $ 125.00 | no /yes | 03/17/06 | 05/20/06 | x |
| 1095817589 | 156.22 | yes | - | 04/15/06 | x |
| 1088724700 | 156.22 | yes | - | 04/15/06 | x |
| 1094387381 | 156.22 | yes | - | 04/15/06 | x |
| 7300453375 | 95.91 | yes | - | 04/08/06 | |
| 1070322817 | 105.00 | no | - | 01/14/06 | |
| 7512473485 | 106.93 | yes | - | 03/04/06 | |
| 7527238586 | 106.93 | yes | - | 03/04/06 | |
| 1088292197 | 127.49 | yes | - | 02/25/06 | |
| 7539235500 | 127.71 | yes | - | 02/18/06 | |
| 7654023376 | 107.29 | yes | - | 02/18/06 | |
| 7654023388 | 127.71 | yes | - | 02/18/06 | |
| 1018001270 | 131.97 | yes | 03/24/06 | 02/12/05 | x |
| 1042685332 | 185.05 | yes | 03/24/06 | 02/05.05 | x |
| 1042702202 | 163.90 | yes | 03/24/06 | 02/05.05 | x |
| 1042595938 | 163.90 | yes | 03/24/06 | 02/05.05 | x |
| 1035711990 | 164.67 | yes | 03/24/06 | 01/15/05 | |
| 1033320160 | 164.67 | yes | 03/24/06 | 01/15/05 | |
| 1018001440 | 133.01 | yes | 03/24/06 | 01/08/05 | |
| 1033249841 | 164.93 | yes | 03/24/06 | 01/08/05 | |
| 1024518607 | 165.95 | yes | 03/24/06 | 12/11/04 | |

| | | | | |
|---|---|---|---|---|
| 1024518619 | 133.84 | yes | 03/24/06 | 12/11/04 |
| 1018151606 | 134.90 | yes | 03/24/06 | 11/06/04 |
| 1016037351 | 67.50 | yes | 03/24/06 | 10/30/04 |
| 1015588426 | 85.05 | yes | 03/24/06 | 02/05/05 |
| 1013747513 | 168.01 | yes | 03/24/06 | 10/16/04 |
| 3903241180 | 75.00 | no | 03/24/06 | 04/15/04 |

**total  $ 3,600.98**

Notably, the total sum as listed in the DOF's supporting documents do not equal the amount of the stated claims of "3,800.98" or "$4,123.46."  Debtor, without additional information, is unable to reconcile them, except to assume these discrepancies include undisclosed charges for interest.

Furthermore, these supporting documents reveal that, with respect to each and every summons/claim, "acts" were being performed by "RES" or "PVB" during the period in which the automatic stay was in effect.  Again, without additional information which is in the sole custody and/or knowledge of DOF, Debtor is unable to determine what "acts" were performed and what, if any, significance these "acts" may have in determining whether these acts constituted additional violations of the automatic stay.  If any of these "acts" represent the DOF's efforts to record its claim/claims as a judgment against Debtor, or in any way represent a "collection action" on the part of the PVB or DOF, Debtor points out that each and every such action or "act" would be a violation of the automatic stay.  Debtor calls upon the Department of Finance, in its response to the Debtor's instant motion, to reconcile the discrepancy in the amount of its claim with the itemization submitted as well as to provide a full disclosure of any and all "acts" of RES or PVB during the period October 16, 2005 – May 20, 2006 as reflected on the supporting documents submitted to the Bankruptcy Court Clerk..

The Department of Finance filed an amended Proof of Claim on October 7, 2008, Exhibit F, which on its face purports to allege a claim, "secured" by a motor vehicle.   The basis for the perfection of its security interest is "see enclosed."  The amount of its secured claim is left blank, and an amount of $4,123.46 is alleged as unsecured.  The two pages of supporting documentation offer no support for DOF's claim of any "secured" claim in a motor vehicle or establish the manner any "secured claim" may have been perfected.  In its "Response" in opposition to Debtor's previous

motion, counsel for DOF clarifies that "DOF's general unsecured claim represents the amount of Debtor's outstanding fines, penalties and interest . . . $5,031.59, exclusive of towing and storage charges." *See* Paragraph 14 of DOF's "Response" (Docket No. 262).

The attached computer print-outs verify that there are twenty-seven (27) summonses and decrease the number NOT in judgment from 3 to 2 – the unpaid assessments for Summons number 1072465735 were also apparently reduced to judgment. Again, there is a discrepancy in the amounts claimed by DOF in its amended Proof of Claim, and the total of the sums reflected on the print-outs: the print-outs total $5,138.10 through "interest date" of November 3, 2008. Debtor is unable to reconcile these arithmetic discrepancies.

## __Violation of the Discharge Injunction Pursuant to 11 U.S.C. §§ 727 & 524__

U.S. Bankruptcy Court Chief Judge Bill Parker, recently wrote in In re Mooney, 340 BR 351 (E.D.TX 2006):

> The United States Supreme Court recently described the protection which a debtor derives from the entry of a discharge order as one of the "[c]ritical features of every bankruptcy proceeding...." *Cent. Virginia Cmty. Coll. v. Katz,* ___ U.S. ___, 126 S.Ct. 990, 996, 163 L.Ed.2d 945, 74 U.S.L.W. 4101 (2006). As one court addressing the violation of a discharge injunction has stated,
>
>     "[T]he basic purpose of the bankruptcy system is to provide the debtor with a 'fresh start. ... Discharge is the legal embodiment of the 'fresh start.' It is the barrier that prevents creditors from reaching the wages, property, and other assets of debtors in bankruptcy. In other words, discharge establishes a legal right not to pay a debt and safeguards against harassment by the creditor...." *Walker v. M & M Dodge, Inc. (In re Walker),* 180 B.R. 834, 840-41 (Bankr. W.D.La.1995). In fact,
>
>     "The automatic stay and discharge injunction are cornerstones of bankruptcy law. They are, respectively, a fundamental debtor protection and a fundamental debtor objective. The automatic stay assists debtors in regaining their financial footing by allowing them to do so free from collection efforts. And, having successfully completed the bankruptcy process, discharge provides debtors with a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt. But the automatic stay and discharge injunction must be enforced to provide

any meaningful protection or incentive." *Curtis v. LaSalle Nat'l Bank (In re Curtis),* 322 B.R. 470, 483 (Bankr.D.Mass. 2005) (internal citations and quotations omitted).

Indeed, when a discharge injunction is violated, a debtor is denied one of the primary benefits offered by the present bankruptcy system. *In re Mooney*, 340 BR at 358.

11 U.S.C. § 524 provides, in pertinent part:

§ 524. Effect of discharge

(a) A discharge in a case under this title—
(1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;
(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and
(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor of the kind specified in section 541 (a)(2) of this title that is acquired after the commencement of the case, . . . . . .

In November 2008, the Debtor purchased a 1997 Subaru station wagon in replacement of the 1992 Subaru which was seized and sold by the NYPD and DOF on March 22, 2006. Debtor registered this vehicle with the Department of Motor Vehicles in January 2009, and was given license plate number ENU 6877.

This Court granted Debtor a Discharge of Debts by its Order dated May 9, 2009.  *See* Docket No. 249.

On May 21, 2009, two (2) weeks after this Court granted Debtor's Chapter 7 Discharge, and while the Debtor's 1997 Subaru was legally parked, Marshal Jeffrey S. Rose, acting individually and on behalf of the PVB, seized and impounded the Debtor's vehicle in furtherance of the PVB's efforts to levy on Debtor's property to collect its claimed judgment for "fines and penalties."  The claims/judgments of DOF executed by City Marshal Rose on May 21, 2009, itemized the same parking violations and fines and penalties, the collection of which were twice made known to

Marshal Rose to have been prohibited by the automatic stay granted by the Debtor's bankruptcy proceedings then pending in January 2006, and which required the return of Debtor's vehicle to him on January 24, 2006 and January 30, 2006. DOF's and City Marshal Rose's seizure, impounding and demand for Debtor to pay the judgment of the PVB in full (and payment of all costs of collection, towing and storage charges) demonstrates a willful violation of the discharge injunctions as set forth in §524.

Subsequent to May 21, 2009, Debtor met with or contacted various staff members at the adjudication department of the Parking Violations Bureau/DOF, and was advised the DOF maintains that "parking fines" are not discharged in Chapter 7 discharges. The DOF maintains that while its claim/judgment was stayed under §362(a), while proceedings were pending under chapter 13 and chapter 7, upon Debtor's discharge of May 9th, the DOF was free to pursue collection efforts of its claim/judgment.

Debtor contends that all claims of DOF for parking fines and penalties which pre-date the date of the conversion of the chapter 13 proceeding to chapter 7; i.e., March 9, 2006, were discharged by the Court's Discharge Order dated May 9, 2009, and all further attempts for their collection by the DOF and City Marshal Rose are in direct violation of the protections of §727 and §524. Debtor further contends that City Marshal Rose and the DOF are liable to Debtor for actual damages sustained by Debtor. Debtor also claims that punitive damage be assessed in this matter as the Court will determine appropriate.

## The Correct Interpretation & Application of 11 U.S.C §523(a)(7)

Debtor seeks the determination by the Bankruptcy Court that the fines and penalties as claimed by the Parking Department of Finance are not "fines and penalties" as those words are intended by the United States Congress to be interpreted in 11 U.S.C §523(a)(7).

§ 523. Exceptions to discharge
**(a)** A discharge under section 727 . . . does not discharge an individual debtor from any debt— . . .
**(7)** such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss . . .

No matter the door by which one enters into this fray, they all lead to (and from) the Supreme Court's holding in *Kelly v. Robinson*, 479 U.S. 36 (1986).

Choose the *front door* and address the Supreme Court's ruling in *Kelly* head on. The Supreme Court's holding in *Kelly* reads as follows:

> Section 523(a)(7) preserves from discharge in Chapter 7 any condition a state criminal court imposes as part of a criminal sentence. Thus, restitution obligations, imposed as conditions of probation in state criminal proceeding, are not dischargeable.

> (a) Despite the language of the earlier Bankruptcy Act of 1898 that apparently allowed criminal penalties to be discharged, most courts refused to allow a discharge to affect a state criminal court's judgment. When the present Bankruptcy Code was enacted in 1978, there was a widely accepted judicial exception to discharge for criminal sentences, including restitution obligations imposed as part of such sentences. In construing the scope of bankruptcy codifications, this Court has followed the rule that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific. *Midatlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494 (1986).

> (b) The basis for the judicial exception here is the deep conviction that federal bankruptcy courts should not invalidate the results of state criminal proceedings. Although it might be true that Congressional officials could have ensured continued enforcement of the state criminal judgment against respondent by objecting to discharge under the Code, that fact does not justify an interpretation of the Code that is contrary to the long-prevailing view that fines and penalties are not affected by a discharge. Moreover, reliance on a right to appear and object to discharge would create uncertainties and impose undue burdens on state officials. The prospect of federal remission of judgments imposed by state criminal judges would hamper the flexibility of those judges in choosing the combination of imprisonment, fines, and restitution most likely to further the rehabilitative and deterrent goals of state criminal justice systems.

> (c) On its face, §523(a)(7) does not compel the conclusion that a discharge voids restitution orders imposed as conditions of probation by state courts. Nothing in the House and Senate Reports indicates that this language should be read so intrusively. Section 523(a)(7) protects traditional criminal fines. Although

restitution, unlike traditional fines, is forwarded to the victim and may be calculated by reference to the amount of harm the offender has caused, neither of the state's qualifying clauses – namely, the fines must be "to and for the benefit of a governmental unit," and "not compensation for pecuniary loss" – allows the discharge of a criminal judgment that takes the form of restitution. The decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the defendant's situation.

The word "criminal" appears eleven (11) times in the Supreme Court's holding. "Civil" does not appear a single time.

The *back door* opens upon other judges' decisions. In *Empire Bonding Agency v. Lopes (In re Lopes,),* Case No 05-36535 (SDNY, 2006), Judge Cecilia Morris concluded:

> . . . the bankruptcy courts relied upon *Kelly v. Robinson*, 479 U.S. 36 (1986), in which the Supreme Court provided bankruptcy courts with guidance as to the manner of debt that §523(a)(7) was intended to protect from dischargeability. . . . . .
>
> " . . . [W]e hold that §523(a)(7) preserves from discharge any condition a state criminal court imposes as part of a criminal sentence . . . [§523(a)(7)] creates a broad exception for all *penal sanctions,* whether they be denominated fines, penalties, or forfeitures. Congress included two qualifying phrases, the finds must be both to and for the benefit of a governmental unit and not compensation for pecuniary loss." *Id.* at 50, 51. . . . .
>
> Penal sanctions therefore, are sanctions imposed by a state criminal court as a part of a criminal sentence, and it is this type of debt that the Supreme Court has determined to be non-dischargeable in bankruptcy. As stated, a majority of bankruptcy courts have interpreted the *Kelly* decision to exclude non-penal forfeitures from the purview of §523(a)(7). *See generally Pioneer General Insurance Co. v. Paige (In re Paige),* 1988 WL 62500 (Bankr. D. Colo, 1988) (Debtor incurred debt as a result of voluntarily assuming the role of a surety or guarantor, arising from purely financial and contractual arrangements, and thus, debt was dischargeable); *see also In re Collins*, 173 F.3d 924 (4th Cir. 1999) (surety bonds posted by professional sureties are contractual obligations, subject to general rules of contract law); *In re Hickman*, 260 F.3d 400 (5[th]

Cir. 2001).

The back-door approach likely requires more than a single court's opinion to carry the weight and authority to be fully persuasive and resolve the issue.

More than fifteen (15) years ago, the Third Circuit recognized that Philadelphia's 1989 amendments to its charter, pursuant to Phila. Code and Charter §12-2801(2), severed the jurisdiction of the criminal justice system pertaining to parking violations and delegated it to an administrative body. *See O'Neill v. City of Phila,* 32 F.3d, 785 (3rd. Cir 1994). This transition, the Third Circuit concluded, changed parking fines from criminal to civil offenses.

> Prior to June 1, 1989, the "Traffic Court of Philadelphia" had original jurisdiction to adjudicate parking violations committed in the City of Philadelphia. 42 Pa.Cons.Stat.Ann. §§ 1302 and 1321. Appeals from the traffic court's decisions were heard by the Pennsylvania Court of Common Pleas. . .

> In 1989, the Philadelphia City Council reorganized the City's system for adjudicating parking tickets by enacting an ordinance which authorized the Office of the Director of Finance to assume control over the regulation and disposition of parking violations in the City of Philadelphia. 12 Phila. City Code § 12-2802(1). Under the new framework, a parking ticket is affixed to the vehicle, *id.* § 12-2804(3), and the owner of the ticketed vehicle is sent a notice by first class mail. *Id.* § 12-2805(1). The person to whom the ticket is issued has fifteen days to answer it, either admitting the violation by payment of the fines, costs, and fees, admitting with explanation, or denying liability and requesting a hearing. *Id.* § 12-2806(1). A failure to answer or to pay the fine will result in a Bureau of Administrative Adjudication ("BAA") hearing examiner's entering an order by default sustaining the charges, fixing the appropriate fine, and assessing appropriate costs and fees. *Id.* § 12-2807(3). . .

> When the violation is contested, and a hearing is requested, a BAA hearing examiner holds a hearing and determines whether the charges have been established. *Id.* § 12-2807. Once the hearing examiner has entered his decision, the violator has thirty days to file an appeal to the BAA Parking Appeals Panel. *Id.* § 12-2808. The BAA's decision, or a default by the ticket holder, creates a debt owed to the City. *Id.* § 12-2808(5). The decision of the Parking Appeals Panel can be appealed to the

Pennsylvania Court of Common Pleas, and through the state judicial system. 2 Pa.Cons.Stat. Ann. § 752. .

**The effect of the 1989 reorganization was to change the nature of parking violations from summary offenses, which were criminal in nature, to civil violations**. . . *O'Neill v. City of Phila,* 32 F.3d, 785, 786-87. (emphasis added)

A comparison of the changes in Philadelphia's handling of parking fines in 1989 with the changes in NYC's handling of parking fines in 1989 will reveal that both cities enacted very similar legislation which made parking infractions a purely civil matter, one which would be determined by an administrative agency within each city.

More recently, *In re Joanne Jester*, Judge Golden of the U.S. District Court for the Eastern District of Pennsylvania was presented an appeal from the bankruptcy court with a case having as close a fact pattern as the one presented by Debtor's as one can hope to find. In *Jester*, the Philadelphia Parking Authority (PPA) appealed the bankruptcy court's decision holding the PPA in contempt for violating the automatic stay of §362(a), and the award of damages to Debtor.

In *Jester*, it seems that the PPA had impounded Jester's car 5 days after Jester's chapter 13 bankruptcy petition was filed, but formal, written notice of the bankruptcy proceeding had not yet been sent to the PPA. Jester testified; however, and the Bankruptcy Court believed her testimony, that she had gone in person to the PPA on two occasions to talk about her car, during which times she told the employee with whom she was speaking of the pending bankruptcy. Jester's verbal statements to the PPA of her pending bankruptcy were considered sufficient to place the PPA on legal notice of the pending bankruptcy proceeding.

While Jester had about $1,000 in past due parking fines which were scheduled and filed with her bankruptcy petition, the PPA impounded Jester's car initially because it was not properly registered. The PPA attempted to argue to the bankruptcy court, and then again on appeal to the District Court, that it's actions from the impounding of Jester's vehicle through its detention and eventual auction sale was in the exercise of its police powers 362(b)(4) or in the exercise and/or continuation of PPA's criminal enforcement powers under section 362(b)(1).

Neither the bankruptcy court nor the District court were persuaded by the attempted legal gymnastics by the PPA to try to avoid liability and justify it's actions as the exercise of its legitimate authority to protect the citizens from harm 362(b)(1) or PPA's police powers s362(b)(4).   While the initial impounding of the vehicle may have been the result of its exercise of a legitimate police power, the withholding of the vehicle after notice of the pending bankruptcy proceeding AND its eventual sale were determined by the courts to be in furtherance of its collection activities for the outstanding parking fines.

The PPA next tried to argue that it's auctioning of the car was in an effort in inventory control as the PPA had too many unredeemed cars and needed to make room.  Here again, neither court was persuaded by PPA's contrived justificatinons..

DOF has previously attempted to argue all the same defenses as the PPA argued in *Jester*.  Debtor is confident that this Court will not be distracted by the DOF's chaff intended to deflect the Court's focus from the real issues before it.  This Court will surely and adroitly as the Bankruptcy Court and the District Court in *Jester* disregard DOF's desperate attempts to spin its actions and motivations to avoid the imposition of contempt sanctions.

Front door – back door – now, a lateral approach thru a side door - maybe the window.   The state and/or local legislatures in New York and Pennsylvania, Ohio and Illinois have enacted remarkably similar laws (to each others') with the specific goal and intention to change the legal character of parking fines – from statutory violations previously considered "criminal" to infractions which would have a purely "civil" character.   The jurisdiction to adjudicate parking infractions was handed over to administrative bureaucracies and civil servants[2.] - in NYC this authority was delivered into the hands of the Parking Violations Bureau / Department of Finance.

---

[2.]   In New York State, the de-criminalization of parking fine offenses in mere civil matters and the divestment of jurisdiction from trial courts to administrative agencies (PVB's) only pertained to those cities with populations greater than one million persons.

> In Illinois before 1987 and in a majority of the states to this day,
> parking violations were and are technically criminal violations even
> when the maximum punishment is a modest fine; and the violator was
> and in the other states is entitled to the usual safeguards of the criminal
> process. A number of states, however, have decriminalized parking
> violations and substituted a civil penalty system. *See, e.g., Gardiner v.
> City of Columbus*, 941 F.2d 1272, 1274 (6th Cir. 1988); 1992
> Cal.Adv.Legis.Serv., see ch. 1244, §1 (Deering). Gardiner upheld
> Ohio's system against a challenge similar to that mounted by the
> plaintiffs in the present case.) Illinois joined these states in 1987 by
> authorizing its municipalities to adopt such systems if they wanted,
> 625 ILCS P 5/11-208.3 Chicago took up the invitation, as we said, in
> 1990. *Van Harken v. City of Chicago*, 103 F3d 1346, 1348 (7th Cir.
> 1996)

Debtor submits that the history of the judicially created exception that criminal fines would not be discharged in bankruptcy (and the subsequent codification of this exception into later enactments by the U.S. Congress), the Supreme Court's decision in *Kelly v. Robinson* affirming the application of the exception to "traditional criminalfines", recent judicial opinions in this circuit as well as others, and a simple, common-sense reading of the language of Article 2-B itself will lead to the inescapable conclusion that the parking fines and penalties assessed by the NYC Parking Violations Bureau/Department of Finance are purely civil debts, the exception to discharge for "fines and penalties" under §523(a)(7) does not apply to the civil assessment by PVB/DOF , and are discharged by a Chapter 7 Discharge Order in the same manner as other civil debts, just like the statute reads.

In the "Response" previously filed by Michael Cardozo, Esq., Corporation Counsel for the City of New York, on behalf of his client, the Department of Finance, (Docket No. 262), Mr. Cardozo displays a tendency to make bald and sweeping statements of purported fact which are not only and simply wrong, the cases with which he supports his pronouncements are either out of date or don't support his arguments. His proclamations in paragraphs 61 and 62 that the law is clear, and settled, and allows no doubt: "parking fines are nondischargeable debts under chapter 7 of the Code" would be laughable but for the fact of his position.

Four cases are cited, which purportedly leave no room to question the authority of his prognostications, were either decided prior to the 1990 and have no application

to the issues presented by the legislative amendments of Article 2-B, or are opinions of out-of-state courts which are not controlling, but more importantly pertain to court procedures and state and local laws which bear no similarity to those as pertain to this matter before the bankruptcy court. Debtor is criticized for being "unable to point to any authority to persuade this Court," then to argue "[t]o provide Debtor the opportunity to attempt to prove otherwise would only promote needless expense and delay."

From Mr. Cardozo's position alone, we may require and rightly expect a far greater competence and accomplishment of advocacy. When the personal attacks of Debtor which can be found peppered throughout the DOF's previous "Response" are considered in relation to the mis-statements of law he forcefully propounds on DOF's behalf, Debtor suggests a question arises which calls into question whether the DOF's contentions are made in "good-faith."

<u>**Damages**</u>

At all times since May 21, 2009 and up through the date of the Debtor's preparation and filing of this Motion, Debtor's 1997 Subaru has remained in the custody and control of City Marshal Rose and DOF - held hostage to secure the Debtor's payment for monies that the DOF and Marshal Rose know, or certainly should know, have been discharged.

Further efforts of DOF and Marshal Rose intended to coerce Debtor to pay monies on his discharged debt to DOF include the refusal and failure of City Marshal Rose and DOF to return the Subaru's license plates to Debtor. Debtor has been deprived of the use of his car; his car has been parked and stored at the back of some lot under the control of City Marshal Rose and DOF, unmoved for the last fifteen (15) months, accruing additional charges for "storage" of $20 per day (15 months times 30 days times $20/day equals $9,000). Debtor cancelled his auto policy with State Farm in July 2009 as Debtor and attorneys for DOF agreed that that this litigation could go on for another 3-5 years (considering appeals and such). With auto insurance premiums on the far side of $2,000 annually, it would be preposterous to expect that Debtor would maintain auto insurance under such circumstances as presented here. In

fact, if Debtor continued to pay for insurance on a car which cannot be used, to insure against labializes which could not possibly occur, and without any end date in sight, what financial management lessons would he be demonstrating to this Court that Debtor has learned throughout these proceedinsg?

A vehicle's license plates, however, are the property of DMV, and must be returned to DMV immediately upon the termination of insurance under threat of DMV's assessment of significant fines and penalties for failure to do so. City Marshal Rose and DOF refused to return the license plates to Debtor despite his repeated requests. As a result, Debtor's driving privileges in NY were suspended. Further, Debtor was assessed a penalty of an additional 404 days of suspension – to commence upon the date the plates are finally turned in to DMV. The refusal and failure to return the plates to Debtor by Marshal Rose and DOF, and the attendant license suspension have caused Debtor to suffer damages far more than mere inconvenience.

Not only can't Debtor drive his own car; he can't rent a car without avalid driver's license. At some point in the last year, Debtor misplaced his license, and the DMV refused to replace it because Debtor's privileges have been suspended. Without photo ID, getting thru a simple day in NYC can become a real ordeal. Someone asks for ID, normally you flip them a peek of the license in your wallet, they give you a nod, and you move on. Without a license, it becomes a "story." Why don't you have a license? What other picture ID do you have? No, a credit or debit card isn't sufficient. Birth certificate, social security card, letter from a priest – none work. Just try keeping an appointment with Trustee's attorneys at their offices without photo ID; the lobby guards will tackle you before you can get into an elevator.

Verification of information supplied by potential clients, customers, and employees by landlords, businesses, insurance companies and employers, who can easily run a simple check on their computers, is now commonplace. Credit reporting agencies have access to DMV records and a license suspension can significantly affect a credit score. Cholesterol, a silent killer, is no more virulent, its affects no more devastating, than the damage an adverse decision can have to one's life, based on the results of a computer "search." One can never really be certain what factors were

considered and weighted, whether the license suspension/ revocation was, in fact, a factor.  If so, what role did it play in the decision making?

And now we've arrived at the real question: Can anyone ever know, really be sure enough, to be able to "prove" damages in such situations.  Were City Marshal Rose/DOF truthful when providing the reason for not to returning Debtor's license plates: that they can't store a car at a parking/storage lot without its license plates[3]? Or just providing a subterfuge to hide the true motivation to retain the Debtor's license plates? The DMV's license suspension/revocation policies are unquestionably known to both City Marshal Rose and DOF.  Did the likely suspension of Debtor's driving privileges play part in City Marshal Rose's refusal to return the Debtor's plates? Does the threat of the suspension process of DMV play any part in DOF's overall strategic plan to motivate/coerce the payment of parking fines and increase the City's revenues? City Marshal Rose – who is not a city employee, who receives no salary from NYC, who is a modern-day bounty hunter riding high, not upon a horse, but a tow-truck, keeping the City's streets safe and free – earns his living from the commissions he's paid by the City - a percentage of how much his collection efforts add to the City's coffers.   In other words, marshals share a piece of DOF's pie.

Many impounded cars, however, have a value far less than the payment required for their redemption.  In such cases, owners fail to redeem, their cars go to public auction, and the proceeds of the sale rarely even satisfy the charges for the storage and initial towing.  There's seldom anything left over the pay the marshal's commission on the sale and levy – forget any funds flowing to the city to pay the parking fines, purportedly the goal of the entire exercise.  The DMV license-suspension threat to the parking fine scofflaw, therefore, becomes the marshal's best

_____

[3.] This statement, in fact, completely misstates applicable law.  All cars must be registered and have valid license plates to be driven or parked on public streets and property.  Cars parked/stored on private property do not require license plates and cars without plates parked on private property present no legal liability to the property owner.  Automobile dealers, for example, park/store cars on their lots without plates, and suffer no fear of reprisal.

weapon to ensure a piece of the pie; *i.e.* plates make PIE.  The marshal's staff holds tightly onto the license plates - with both hands.

When determining damages for violations of the bankruptcy protections, a court must look beyond the words spoken by the parties, which are always spun so tightly one wonders how some lawyers can hold their feet on the floor, and apply its experience and common sense to the totality of the circumstances.  When the question above about truthfulness is reconsidered in light of "pie," there's no longer any doubt.

Section 362(h) was added to the Bankruptcy Code to provide an enforcement mechanism to protect a debtor from creditors who "willfully" violate the automatic stay.  *E.g., In re Solis,* 137 B.R. 121, 129 (Bankr. S.D. N.Y. 1992).  Subsection (h) provides that:

> An individual injured by any willful violation of a stay provided by this section **shall** recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, punitive damages.  11 U.S.C. § 362(h) (emphasis added).

Congress' employment of "shall" in this section is clear evidence of its intention to make certain that debtors are fully compensated, and that the award of damages assessed the offending creditor is a meaningful amount to foster a low creditor recidivism and that the "lesson learned" by the creditor stays learned.

"Actual damages" have been interpreted to include financial damages suffered by the debtor as well as damages for a debtor's emotional distress or emotional injury . *See, e.g.* the opinion of former U.S. Bankruptcy Chief Judge Stephen Gerling's opinion in *In re Ficarra*, Case no. 00-62714 (N.D.N.Y. 2006).  Judge Gerling also determined: "As a supplement to actual damages and attorney's fees, the Second Circuit has held that the provision in Code §362(h) for punitive damages applies where there is 'an additional finding of maliciousness or bad faith on the part of the offending creditor . . .' *Crysen,* 902 F.2d at 1105."

Further, Congress' recognition that actions and laws of states and cities can also infringe upon the protections and goals of the protections provided to debtors under the bankruptcy code is clearly evidenced  by the additional teeth of 11 USC § 106, which provides, in pertinent part:

11 USC § 106  **-**  Waiver of sovereign immunity

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105 . . . . of this title.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections or the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. . . .

(b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

In the event that Debtor's reading of subsection (3)(b) above is correct, and that punitive damages are awardable in appropriate circumstances where the governmental unit has 1) filed a proof of claim, and 2) the damages suffered by debtor are related to the facts and circumstances out of which the governmental unity claim arises or is based, then the Debtor will ask the Court to assess damages which reflect those actually suffered by Debtor as well as additional amounts to insure that the offending / offensive actions of  DOF and Marshal Rose will not occur again in the future.

The Department filed **TWO (2)** proofs of claim in this case, so the first prong of Debtor's reading of (3)(b) is satisfied.  Furthermore, the Proofs of Claim as completed and filed with the Bankruptcy Claims Clerk incorrectly represent the nature and the amount of DOF's claim.  Contrary to the representations on the amended Proof of Claim, any claim that DOF may have is "unsecured."    See Exhibits E and F.

The second prong requires that debtor's damages arise from the circumstances out of which the government's claim arose – in this situation that the Debtor's damages arise out of the DOF's levy and impounding of Debtor's automobile in violation of §362(h) and §§727 & 564(a).

Despite the Debtor's requests, the 1997 Subaru's license plates have never been returned to Debtor.  Debtor attaches the suspension notification of Debtor's driving privileges from the DMV as the result of Debtor's inability to turn in his

plates. See Exhibit G. Not only did the DMV suspend Debtor's current privileges, once the plates are returned, the DMV is empowered to assess an additional penalty of one day's suspension for each day that Debtor was delinquent in returning the plates after canceling the automobile insurance in July 2009.

A year's effort by Debtor to resolve the license plate problem included:

• at least five (5) trips to the DMV office at 34th Street and Sixth Avenue, where Debtor was offered five (5) different "solutions" to resolve his suspensions, none of which lead to a resolution;

• approximately five (5) telephone calls to the DMV's offices in Albany resulting in one suggestion of a "solution";

• one truly wasted afternoon and field trip to 210 Joralemon St, Brooklyn  and the Marshal Scoff Program on May 27th;

• three (3) visits to the PVB's offices at 66 John Street, the last on May 27,  2010 which not only was a complete waste of Debtor's time, Corporation counsel and the DOF have used the administrative/ clerical error entered on the PVB's computer records as an opportunity to call the Debtor a liar to undermine the Debtor's integrity and credibility to this Court in its "Limited Response" filed on June 15, 2010 (Docket No.270).[5.]

• several letters to the DMV, some mailed, some faxed, some with money orders enclosed, requesting certified copies of DMV's documents, to provide proof that allegations against Debtor made to this Court by DOF's agents were untrue.

Debtor is pleased to report to this Court, and despite the obstructive efforts of City Marshal Rose and the DOF, Debtor has resolved all license plate / suspension issues with DMV. On August 26, 2010, Debtor's driving privileges were restored without further penalty.  For the Court's consideration, Debtor attaches copies of relevant documents as ***Exhibit G.***

------------------------

[5.] Debtor suspects that he's not heard the last of these offensive and slanderous comments in future papers and oral statements from DOF and its attorneys.  Debtor hereby places DOF on notice that Debtor will not tolerate these comments any further and will vigorously pursue their prosecution in the future.

Debtor's damages arise from the actions of City Marshal Rose and the DOF to levy upon Debtor's property and wrongfully attempt to coerce payment from the Debtor, when City Marshal Rose and DOF are fully aware of the impropriety of their

actions, that the debts claimed by them have been fully discharged by the Court's previous order, and their actions to collect the debt are fully prohibited by the Bankruptcy Code. What makes the actions of DOF and City Marshal Rose so unconscionable is that they have been expecting this day for, at least, the **last nineteen (19) years**. They have been on written notice that there would be a day of reckoning; they knew that they would be found out one day; that all things wound change, and they apparently decided to deal with that day when it comes.

That it would be this Debtor and this case comes as a great surprise – and no one is more surprised than Debtor himself - but City Marshal Rose and the DOF have had a nineteen (19) year run, a lot of money has been made and/or collected to which they were not entitled, and it's likely that any damage assessment or penalties assessed against City Marshal Rose and the DOF will be paid back with the funds that should never have been collected in the first place.

The *Opinion of the NY State Comptroller Number 91-37* addressed the legislative amendments which created the PVBs and revised the jurisdictional authority for the assessment and collection of parking fines and penalties in New York City.

Responding to an inquiry from the Director of the Justice Court on the impact and effect of amendments to Article 2-B *vis-a-vis* the distribution of revenues from parking fines and penalties, the Comptroller's published opinion clearly announced the winds of change had far-reaching effects upon the revenues for every State, County, City, and Municipal agency. According to the NYS Comptroller, changes occasioned by the 1990 amendment of Article 2-B included:

> . . . . The cities of Yonkers, New York, Buffalo and Rochester are authorized to establish PVB's governed by the provisions of article 2-B of the Vehicle and Traffic Law (§§235-244). PVB's are administrative tribunals that have jurisdiction of traffic infractions constituting parking, standing or stopping violations. . . . . .
>
> . . . . Fines and penalties collected by a PVB are <u>civil</u> in nature and enforceable in the same manner as the enforcement of money judgments in civil actions . . . . .
>
> . . . . [A] PVB is an administrative tribunal which imposes fines and penalties of a civil nature that are enforceable in a civil action in

like manner as a civil money judgment is enforced. Therefore, fines and penalties collected by a PVB are not "collected under a sentence or judgment of conviction", as provided in section 1803(1). While this distinction may not in and of itself be controlling of the legislative intent, it is worth noting that the other article in the Vehicle and Traffic Law relating to administrative tribunals with jurisdiction over traffic infractions other than parking, standing, stopping, or pedestrian offenses (article 2-A, §§ 225-228 – see reference to §227 in quote above), although providing that the proceedings and the fines and penalties are civil in nature (see §227[4][a],[b]), also provides specifically that a final order "shall be treated as a conviction for the purposes of this chapter" (§227[4][a]). Article 2-B, relating to PVB's, does not contain similar language.". . . . *See Opns St Comp No 91-37*, dated September 1, 1991.

Has the New York City Commissioner(s) of the Department of Finance been unaware of this determination by the New York State Comptroller for the last nineteen (19) years, or has the Commissioner simply ignored it?

The New York City Comptroller's Report for Fiscal 2009 (ending June 30, 2009) reveals that in FY09, New York City collected $595 million dollars in payment of parking fines, and the total value of all summonses issued by various City agencies for parking violations, exclusive of interest was $864 million dollars. At FY 2009's end, the Comptroller carried forward a receivables balance for unpaid/uncollected parking fines, again exclusive of any interest and other fees assessed by DOF upon judgment, of $266 million. This is Real Money. Parking fines are big business in New York City.

Prior to 1990, parking violations were adjudicated on the criminal dockets in the various municipal courts throughout New York State, and the fines assessed were inarguably exempted from discharge in a Chapter 7 proceeding pursuant to 523(a)(7). Article 2-B, however, changed everything. Or, did it?

What if the Department of Finance did . . . nothing? Laid Low. Maintained business as usual. If someone should question DOF's post-discharge collection efforts, a cold hard stare combined with an adamant tone was likely sufficient to dissuade further inquiry. The City of New York and the DOF have obvious vested interests to maintain the pre-1990 status quo. One can understand why the DOF's

been laying low these last 19 years.  It's been business as usual; the collection of unpaid parking fines of debtors post-chapter 7 discharge to be pursued in the same manner as pre-Article 2-B amendments of 1990.

What about the chapter 7 trustee, one might ask?  As there's no obvious payday for a chapter 7 trustee in this dispute, why would a trustee voluntarily get involved? All that the trustee can expect is more work, more hassles, more court appearances, more attorney's fees . . . and then the debtor gets to ride away in the car! Can anyone even feign surprise that Roy Babitt, Esq. informed the U.S. Trustee: "I have no interest in Mr. Bace's automobile or claimed exemption."  Letter of Roy Babitt, Esq. to Susan Golden, Esq., U.S. Department of Justice, dated July 27, 2009. See **Debtor's Exhibit H.**  On page 6-2 of the *Handbook for Chapter 7 Trustees*, the work product of the Chapter 7 Subcommittee of the Advisory Committee of United Sates Trustees and the Chapter 7 Handbook Working Group, however, sitting there, plain as day, is the following:

> "Section 323(a) provides that the chapter 7 trustee is the
> representative of the estate.  The trustee is a fiduciary charged with
> protecting the interests of all estate beneficiaries – namely, all
> classes of creditors, including those holding secured, administrative,
> priority, and non-priority unsecured claims, **as well as the debtor's
> interest in exemptions and in any possible surplus property**."
> (emphasis added)

Obviously, the trustee's handbook must be written in code, where words mean something other than what they ordinarily do.  Otherwise isn't "the chapter 7 trustee . . . a fiduciary charged with protecting . . . the debtor's interest in exemptions . . ."?  Mr. Babitt has assured the U.S. Trustee, however, he has "no interest in Mr. Bace's automobile or claimed exemption."

There's no doubt in Debtor's mind that the NY legislation amending Article 2-B in 1990 converted what was previously a non-dischargeable debt into a dischargeable debt. How is it possible that no one before this Debtor has raised this issue?

Attorneys representing debtors charge *a la carte;* additional motions practice or adversary proceedings are definitely not included on their *prix fixe* menu.  With their discharges tightly clenched in hand, debtors leave the courthouse by the nearest

exit, resolved never to return. What debtor is going to voluntarily crawl back into the fire after just getting out? What debtor has the cash to pursue the issue?

"While §106(a)(1) generally waives sovereign immunity for purposes of an award of compensatory damages under §362, sovereign immunity bars an award of punitive damages against the Government. _See_ 11 U.S.C. § 106(a)(3)." Anthony J. Ciccone , *Automatically Violating the Stay?,* Executive Office for U.S. Attorneys "*In Bankruptcy"* newsletter, Vol. V, No. 3 (Fall 1997). Debtor seeks to persuade the Bankruptcy Court, however, that the City Marshal Rose's and DOF"s programmatic and willful collection efforts of judgments/liens in complete disregard of the protections afforded all debtors under Title 11 U.S.C. 101 *et seq.* is so egregious, is so unconscionable, that punitive damages are an appropriate remedy as presented by the facts and circumstances of this matter.

Punitive damages are indisputably assessable against Marshal Rose, however, as he is neither "government," nor is he a salaried employee of the City of New York, the Department of Finance or any other branch of the City 'Government." ***Debtor's Exhibit I.***

> "§362(h) was added to the Bankruptcy Code to provide an enforcement mechanism to protect a debtor from creditors who "willfully" violate the automatic stay. _E.g.,_ In re Solis, 137 B.R. 121, 129 (Bankr. S.D. N.Y. 1992).
> . . . . .
>      What is required to constitute a "willful" violation of the stay, for purposes of §362(h), is subject to controversy. The most that can be said with any degree of certainty is that each violation of the stay must be considered in its entirety, with due consideration to the particular facts. A willful violation does not require "specific intent" to violate the automatic stay; nor will a "good faith" belief that an action was not violative of §362 preclude a finding that the action was, in fact, a "willful" violation. Rather, the test is usually characterized in terms of whether a creditor took some collection action despite its knowledge that the debtor had filed a bankruptcy petition." Anthony J. Ciccone , *Automatically Violating the Stay?,* Executive Office for U.S. Attorneys *"In Bankruptcy"* newsletter, Vol. V, No. 3 (Fall 1997).

Debtor respectfully suggests that in light of the foregoing facts and assertions of Debtor, once proved or substantiated to the satisfaction of the Bankruptcy Court as trier-of-fact as true, Debtor will have established, in the least, the existence of a

phenomenon in which unknown staff members of the City agency, along with the City marshal's office, may have innocently, inadvertently and/or coincidentally adopted and put in place an agency-wide mis-interpretation of several important provisions of the Bankruptcy Code and Bankruptcy Rules which, when applied, unjustly enrich the City agency and the City Marshal and cause financial loss and injury to the individual debtor and/or the creditors of this and many other Bankruptcy estates managed by the court-appointed trustees.

Or, worse, Debtor argues that the foregoing facts and assertions of Debtor establishes the existence of the willful and purposely conceived and adopted system of collection procedures and the mis-interpretations of several important provisions of the Bankruptcy Code and Bankruptcy Rules, which, when applied by staff members in the former New York City Department of Finance, Parking Violations Bureau (now known as Violations Hearing Board), in concert with City marshals and their employees to support and justify their collection efforts of fines and penalties claimed to be due the PVB, has deprived this Debtor and many other debtors and their creditors of financial assets, claims of statutorily created personal and real property exemptions and constitutional rights to protect property from unlawful seizure.

Debtor respectfully asserts that the issues raised by Debtor in the foregoing Motion bring into question whether important public and private interests and/or important public policy considerations have been violated by the maintenance of the pursuit and collection efforts by City Marshal Rose and the Parking Violations Bureau of the claim/judgment for "fines and penalties" of the Parking Violations Bureau against Debtor and the seizure, impounding and marshal sale of his automobiles.

## Lien Avoidance Pursuant to 11 U.S.C. §522(f)

While maintaining his position that the entirety of the DOF's claim for parking fines was discharged by the grant of the Chapter 7 Order of Discharge, the Debtor contends that the lien avoidance provisions of §522 would also render DOF's claims/ judgments to be unenforceable, at least as it would impair Debtor's interest in his 1992 and 1997 Subaru automobiles which Debtor clearly intended to claim as exempt.

§ 522(f)(1) provides, in pertinent part:

> ". . . the debtor may avoid the fixing of a lien on an interest of the
> debtor in property to the extent that such lien impairs an exemption
> to which the debtor would have been entitled under subsection (b)
> of this section, if such lien is -
> (1) a judicial lien . . . "

Debtor respectfully suggests that former U.S. Bankruptcy Chief Judge Stephen
Gerling's thoughtful and reasoned examination and application of 11 U.S.C. §522(f)
and his analysis of relevant recent case law in *In re Little*, 05-68261 (N.D.N.Y. 2006),
established the test to determine a debtor's right to avoid a judicial lien pursuant to
§522(f).

Section 522(f) provides for the avoidance of the "fixing" of certain liens. To
"fix" means to "fasten a liability upon."   The provisions of §522(f) operate
retrospectively to annul the *event* of fastening.  *In re Chiu,* 304 F.3d 905, 908 (9th Cir
2002) *quoting In re Vincent,* 260 B.R. at 617, and seeks to implement the strong
public policies - in particular, "the fresh start policy of the Code which encourages the
full application of the Code's exemption provisions," *In re Quackenbos,* 71 B.R. 693,
695 (Bankr. E.D.Pa.1987) - that are at play when lien avoidance is sought. As the
Supreme Court has observed, § 522(f) was designed to mitigate the impact of judicial
liens "because they are a device commonly used by creditors to defeat the protection
bankruptcy law accords exempt property against debts." *Farrey v. Sanderfoot,* 500
U.S. 291, 297-98 (1991).

Although *Little* was filed under Chapter 13 and addressed the homestead
exemption, Debtor contends Judge Gerling's lien avoidance analysis applies to
Chapter 7 as well Chapter 13 proceedings to determine whether a judicial lien impairs
a property exemption cognizable under the federal and state schemes and is, therefore,
subject to avoidance under §522(f).  Judge Gerling quickly and succinctly established
the general parameters in which *Little* would be decided:

> The commencement of a bankruptcy case creates an "estate" that is
> initially comprised of all the equitable or legal interests of the debtor in
> property. *Code §541.*   In a chapter 7 case, the trustee collects,
> liquidates, and distributes the estate to the creditors. *Code §§704, 726 .*
> *. .*   Under Code §522(b), a debtor may be able to exempt property
> which allows the debtor to withdraw that property from property of the

estate. This prevents the property from being used to pay debts through the bankruptcy case, as well as preventing most creditors from enforcing their claims through non-bankruptcy collection actions. *See In re Fishman,* 241 B.R. 568, 574 (Bankr. N.D. Ill. 1999).

Exempt property loses its protection if a bankruptcy case is dismissed, however. Moreover, under Code §522(c)(1) - (4), the following debts may be enforced against exempt property: (1) non-dischargeable debts for taxes, custom duties, alimony, maintenance, and child support ; (2) debts secured by valid liens that may not be avoided under the trustee's powers and debts secured by tax liens, if notice is properly filed; (3) certain non-dischargeable debts for fraud and willful injury owed to a Federal depository institutions regulatory agency acting as a conservator, receiver, or liquidating agent; and (4) a debt in connection with fraud in the obtaining or providing of financial assistance for purposes of financing an education at an institution of higher education. *See, e.g., In re Davis*, 170 F.3d 475, 484 (5th Cir. 1999); *In re Fishman*, 241 B.R. at 574.

Exemptions prevent a debtor from losing everything. They also promote a debtor's fresh start after the bankruptcy discharge because the debtor will be able to use the exempt property to aid in financial rehabilitation. *See Marine Midland Bank v. Scarpino* (*In re Scarpino*), 113 F.3d 338, 340 (2d Cir. 1997). *In re Little*, 05-68261 (N.D.N.Y. 2006)

In *Smith v. Slade*, 57 Barb. 637 (N.Y. Sup. Ct. 1870) the court held that the personal property exemption statute was a "remedial statute, enacted for the benefit of families, and it is the duty of courts to see to it that its humane provisions shall not be defeated by technicalities." Further, in *Eagan v. Household Finance Corp.* (*In re Eagan*), 16 B.R. 439, 441 (Bankr. N.D.N.Y. 1982), the court determined that "[b]eing a remedial statute, the exemption provisions of the Code should be liberally construed" in favor of the debtor.

11 U.S.C. §522(b) establishes the three statutory bases creating a debtors' right to claim an exemption:

(1) debtors can claim under the federal exemptions listed in §522(d);

(2) debtors can only exempt (i) property that is exempt under "Federal law" other than that listed in §522(d) and (ii) any property that is exempt under the state or local law of the debtors' domicile; and

(3) debtors can choose to claim under the §522(d) federal exemptions or the exemptions established by the laws of the state of their domicile.

As Judge Gerling pointed out, the State of New York has selected the second option and "opted out" of the federal exemption scheme. New York Debtor and Creditor Law ("NYD & CL") §§282 and 284 provide the permissible exemptions available to debtors residing in this state. New York Debtor and Creditor Law §282 provides, in pertinent part:

> § 282 Permissible exemptions in bankruptcy.
> . . . [A]n individual debtor domiciled in this state may exempt from the property of the estate, to the extent permitted by subsection (b) thereof . . . the following property:
>
> 1. Bankruptcy exemption of a motor vehicle. **One motor vehicle not exceeding twenty-four hundred dollars in value above liens and encumbrances of the debtor**. (emphasis added)

11 U.S.C.§522(c) defines the consequences of exempting property from the bankruptcy estate: "property exempted under this section is not liable during or after the case for any debt of the debtor that arose . . . before the commencement of the case . . . ."

Having established a debtor's right to exempt specific property and a procedural framework in which a debtor can assert the exemption of specific property, Congress established a method to protect the exempted property from the reach of the debtor's creditors, both pre- and post-discharge. The additional provisions of §522 secure exempted property from a creditor's reach to effectuate the general purpose underlying exemption statutes: so a debtor has the means to support himself and his family post discharge. *In re Eldridge*, 32 B.R. 218 (Bankr. D. Maine 1982).

In his dissenting opinion in *Perez v. Campbell*, 402 U.S. 637 (1971), Justice Blackmun explained "one of the purposes of the Bankruptcy Act is to "relieve the honest debtor[5] from the weight of oppressive indebtedness and permit him to start afresh . . ," *Williams* v. *United States Fidelity & Guaranty Co.,* 236 U. S. 549, 554-555 (1915); and that a bankrupt by his discharge receives "a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt," *Local Loan Co.* v. *Hunt,* 292 U. S. 234, 244 (1934). *Id.* at 660.

Congress considered that a debtor's fresh start would be undermined if the exempted property of a debtor were subject to levy or attachment by a creditors holding judicial liens where a creditor's underlying claims were not discharged by granting of a discharge to debtor pursuant to §727.  §522(f) permits a debtor to retain his interest in exempted property and protect his interest from the reach of the levy or attachment of a creditor holding a judicial lien.

11 U.S.C. §522(f) provides, in pertinent part:

> **(f) (1)** . . . [T]he debtor may avoid the fixing of a lien on an interest of the debtor in property to the extent that such lien impairs an exemption to which the debtor would have been entitled under subsection (b) of this section, if such lien is—

_____

**5.** On several past occasions, during the course of motions/adversary hearings and in motions and pleadings, as well as in written correspondence, Judge Drain and Roy Babitt, Esq., Chapter 7 Trustee, have made general and non-specific accusations and remarks impuning the Debtor's integrity and questioning his motivation for filing for bankruptcy protection, as well as contesting the Debtor's entitlement of a discharge under 11 U.S.C. §727.  These accusations have been thrown into Debtor's face by third-parties possessing no more personal knowledge of their substance more than simply having read them in a transcript. Furthermore, the Trustee has previously accused the Debtor of possible commission of crimes under The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and called for an investigation by the U.S. Trustee.

The Debtor has consistently and vehemently denied these repugnant accusations and characterizations of his conduct and motivations.  The Trustee's accusations of criminal acts by the Debtor are absurd; nonetheless, they have been lodged with the U.S. Trustee. Debtor hereby demands the retraction of these accusations and an affirmative finding by the Bankruptcy Court of the Debtor's status as an "honest debtor."

> **(A)** a judicial lien, other than a judicial lien that secures a debt of a kind that is specified in section 523 (a)(5); or
> **(B)** a non-possessory, non-purchase-money security interest . . . .
>
> **(2)  (A)** For the purposes of this subsection, a lien shall be considered to impair an exemption to the extent that the sum of—
> **(i)** the lien;
> **(ii)** all other liens on the property; and

**(iii)** the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

**(B)** In the case of a property subject to more than 1 lien, a lien that has been avoided shall not be considered in making the calculation under subparagraph (A) with respect to other liens.

**(C)** This paragraph shall not apply with respect to a judgment arising out of a mortgage foreclosure.

The term "judicial lien" was recently addressed in the case of *In Re Bradley* (S.D.N.Y., 2007):

The term "judicial lien" is defined in 11 U.S.C. § 101(36) as a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding."

Thus, under the statute, a debtor may avoid the fixing of a lien if three requirements are met: (1) there was a fixing of a lien on an interest of the debtor in property; (2) the lien impairs an exemption to which the debtor would have been entitled; and (3) the lien is a judicial lien. *See Culver, LLC v. Chiu,* 304 F.3d 905, 908 (9th Cir.2002). *In Re Bradley,* (S.D.N.Y. 2007)

The discussion thus far has identified the statutory authority for a debtor's claim of a property exemption and the means by which an exemption can be protected from a creditor's execution of a judgment or security interest which survived the general discharge of debts granted under §727. Applying them to the property of the bankruptcy estates created by the Debtor's Chapter 13 petition and then as converted to Chapter 7 by the Court on March 9, 2006 reveals that the clear and simple logic of Judge Gerling's analysis in *In re Little* of exemption statutes isn't so simple to apply. With what now may seem as clairvoyance, Judge Gerling cautioned against the blind application of the Code's "technicalities" and favored its "liberal construction." In other words, one should avoid rushing to judgment.

On May 31, 2006, the NYC Department of Finance (DOF) filed a Proof of Claim against Debtor's Chapter 7 estate in the amount of $3,800.98. DOF's Proof of Claim (Form B10), prepared by Ms. Concepcion on behalf of the Department of

Finance, reveals the following: the basis of DOF's claim is "fines and penalties;" the date the debt was incurred is "see attached;" and the date of court judgment obtained is "various."

The Parking Violation Bureau's authority to assess monetary punishment and enter judgment for unpaid parking violations is derived from statute. See Chapter 39 of Title 19 of the Official Compilation of Rules of the City of New York and New York Vehicle and Traffic Law Section §237, which provide as follows:

> 39-01 Definitions Parking Violations Bureau.
> "Parking Violations Bureau" is an administrative tribunal in the New York City Department of Finance established to accept pleas to, and to hear and determine charges of traffic infractions relating to parking violations within the City of New York, to provide for monetary fines, penalties and fees for such violations, and to enter and enforce judgments of the Bureau in the same manner as the enforcement of money judgments in civil actions.

New York Vehicle and Traffic Law Section §237 provides, in pertinent part:

> Functions, powers and duties. The parking violations bureau shall have the following functions, powers and duties:
> . . . .
> (5) To enter judgments and enforce them, without court proceedings, in the same manner as the enforcement of money judgments in civil actions in any court of competent jurisdiction or any other place, provided for the entry of civil judgment within the State of New York.

The Parking Violations Bureau is a sub-department of the New York City Department of Finance and has statutory authority to determine civil liability and assess a monetary punishment for parking violations (inartfully referred to as "monetary fines, penalties and fees") issued by authorized NYC employees, and to seek enforcement thereof "in the same manner as the enforcement of money judgments in civil actions."

Having stipulated to its general authority to assess liability and enforce judgments, in theory, we now turn our attentions to determine the practical result of the PVB's enforcement efforts *vis-a-vis* 11 U.S.C. §522(f).

The DOF's Proof of Claim does not establish a claim of $3,800.98 for fines and penalties secured by judgment, as it would appear from the manner in which the form was completed and submitted. An examination of the attached supporting documents indicates **twenty-seven (27)** individual claims and/or judgments:

| Summons Act | Amount | Judgment | Last RES Act | Last PVB Act |
|---|---|---|---|---|
| 1072465735 | $ 125.00 | yes | 03/17/06 | 05/20/06 |
| 1095817589 | 156.22 | yes | - | 04/15/06 |
| 1088724700 | 156.22 | yes | - | 04/15/06 |
| 1094387381 | 156.22 | yes | - | 04/15/06 |
| 7300453375 | 95.91 | yes | - | 04/08/06 |
| **1070322817** | **105.00** | **no** | **-** | **01/14/06** |
| 7512473485 | 106.93 | yes | - | 03/04/06 |
| 7527238586 | 106.93 | yes | - | 03/04/06 |
| 1088292197 | 127.49 | yes | - | 02/25/06 |
| 7539235500 | 127.71 | yes | - | 02/18/06 |
| 7654023376 | 107.29 | yes | - | 02/18/06 |
| 7654023388 | 127.71 | yes | - | 02/18/06 |
| 1018001270 | 131.97 | yes | 03/24/06 | 02/12/05 |
| 1042685332 | 185.05 | yes | 03/24/06 | 02/05.05 |
| 1042702202 | 163.90 | yes | 03/24/06 | 02/05.05 |
| 1042595938 | 163.90 | yes | 03/24/06 | 02/05.05 |
| 1035711990 | 164.67 | yes | 03/24/06 | 01/15/05 |
| 1033320160 | 164.67 | yes | 03/24/06 | 01/15/05 |
| 1018001440 | 133.01 | yes | 03/24/06 | 01/08/05 |
| 1033249841 | 164.93 | yes | 03/24/06 | 01/08/05 |
| 1024518607 | 165.95 | yes | 03/24/06 | 12/11/04 |
| 1024518619 | 133.84 | yes | 03/24/06 | 12/11/04 |
| 1018151606 | 134.90 | yes | 03/24/06 | 11/06/04 |
| 1016037351 | 67.50 | yes | 03/24/06 | 10/30/04 |
| 1015588426 | 85.05 | yes | 03/24/06 | 02/05/05 |
| 1013747513 | 168.01 | yes | 03/24/06 | 10/16/04 |
| **3903241180** | **75.00** | **no** | **03/24/06** | **04/15/04** |

total **$ 3,600.98**

The supporting documents supplied by DOF further reveal that judgment has not been obtained for two (2) of the summonses (1070322817 and 390324180). They are eliminated from this analysis as §522(f)(1)(a) requires a "judicial lien" or a perfected "non-possessory, non-purchase-money security interest." They would retain a status of unsecured claims/debts due the NYC Department of Finance assessed by the DOF, which for the reasons set forth in the previous section of this Motion, Debtor

argues that "fines and penalties" assessed by the PVB for parking violations in New York City are dischargeable civil debts and §527(a)(7) does not apply.

If, as Debtor contends, these two (2) summonses represent unpaid, unsecured civil debts which can be enforced "in the same manner as the enforcement of money judgments in civil actions," they have been discharged. Debtor submits that this argument is not only persuasive, it is also the only logical way in which these words can be interpreted.

It, further, is consistent with the reasoning of Judge Gerling in *Little*. While citing *United States v. Ron Pair Enterprises*, 489 U.S. 235, 242 (1989), for the principle that the plain meaning of legislation should be conclusive (except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the drafters' intentions), he concluded the ultimate goal of statutory construction is to discern legislative intent. It is difficult to conceive language that the Legislature could have employed to more clearly express the "civil" nature of these debts/claims/ judgments: "to enter and enforce judgments of the Bureau *in the same manner as the enforcement of money judgments in civil actions.*"

Our inquiry, however, does not end here. The next question which logically requires the Court's determination is whether §522(a)(7) applies to a "judicial lien" in the same manner as a "debt." A "judicial lien" is not a "debt"; it's a "super" debt. Debt squared. Sections 101 (27) and (28) define a "judicial lien" as "a charge against or interest in property to secure payment of a debt," (See §101(28)) "obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding." (See §101(27)). The resultant anomaly created, however, is that the DOF's twenty-five (25) claims in judgment, which by the NYPD's and/or Marshal Rose's impounding of Debtor's Subarus, have been transformed from a "debt" into a "judicial lien" are subject to §522(f)'s analysis, while the DOF's two summonses not in judgment are not.

In the present matter, the Debtor initially claimed an exemption for a 1992 Subaru on Schedule C up to the amount of $2,950 and filed the schedule with his Chapter 13 petition on October 16, 2005. Debtor assessed the fair market value of the Subaru to be $1,000.00 as of the filing date.

And as everyone by now is well aware, when completing Schedule C, Debtor cited the "federal" statutory exemption provisions of Title 11 as the statutory basis for Debtor's exemption claims, which admittedly were not applicable. On May 2, 2006, Debtor filed an amended Schedule C itemizing the real and personal property for which Debtor claimed an exemption referencing the appropriate the provisions of New York's Debtor and Creditor Law. On his amended Schedule C, however, no exemption was claimed by Debtor for the 1992 Subaru for the simple reason that it had been impounded by the NYPD and sold at auction six (6) weeks prior.

Debtor continues to investigate the Subaru's Who, What, Where and Why, as the Debtor's memory of each and every fact occurring during this extremely hectic period have dimmed with the passage of time. DMV records recently obtained by Debtor, attached as Exhibit B, reveal that the 1992 Subaru was sold at auction by the NYC Police Department as an "abandoned vehicle" on March 22, 2006. While these documents further indicate that the Subaru was sold for $475.00 (sales tax of $39.78 was also collected by the NYC on behalf of the DMV), these documents do not allocate how the sale's proceeds (other than the sales tax) were paid or distributed among the total charges claimed for redemption.

The Debtor has shared these DMV records with Joshua Wolf, Esq., attorney for the Department of Finance and, hopefully, our investigatory efforts will at last unveil the full, detailed chronology of the '92 Subaru's impounding and public sale and be available to present to the Bankruptcy Court. What is known at this point is that the Subaru was sold by the NYPD on March 22, 2006 and its licenses plates were returned to the DMV (presumably by the NYPD) by mid-May.

Debtor is currently investigating the circumstances for the NYPD's impounding of Debtor's 1992 Subaru and its storage at Pier 78, Twelfth Avenue at 38th Street. Prior to the public auction sale of the Debtor's Subaru on March 22, 2006, the Debtor attempted on several occasions to redeem his car; however, in addition to the charges levied by the NYPD (fine, towing, storage), the NYPD also demanded that Debtor pay in full the balance of unpaid claims of the Parking Violations Bureau/Department of Finance. Despite Debtor's providing proof of the bankruptcy proceeding and his attempts to explain the status of the DOF's unpaid claims, the

NYPD's staff at Pier 78 maintained that the charges for Debtor to redeem the Subaru included payment of all outstanding parking fines due the DOF.

In *Owen v. Owen*, 500 U.S. 305 (1991), the Supreme Court established a hypothetical test for determining whether a judicial lien impairs an exemption; i. e. if avoiding the lien would permit the debtor to claim the exemption, then the lien should be avoided under Code §522(f)(1). *Id.* at 311.

In *In re Little*, Judge Gerling reasoned that when applying the *Owen* analysis the first step is to determine whether the debtor is entitled to an exemption under federal or state exemption statutes. The second step is to determine the extent to which the lien may be avoided. *David Dorsey Distrib., Inc. v. Sanders* (*In re Sanders*), 39 F.3d 258, 261 (10th Cir. 1994). The third step is to determine whether the lien actually impairs the exemption. §522(f)(2).

In *Bartlett v. Giguere*, (*In re Bartlett*), 168 B.R. 488, 493-94 (D.N.H. 1994), the district court noted that the bankruptcy code has a rehabilitative goal and that it is to be liberally construed in the debtor's favor. For the court, this meant that a remedial law, which is designed to implement an important social policy, should be construed in favor of its intended beneficiary (the debtor). In *In re Weinstein*, 164 F.3d at 679, citing to *Owen* and *Farrey v. Sanderfoot,* 500 US 291 (1991**)**, the First Circuit declared that a debtor must meet two requirements before a court avoids a lien under § 522(f): "(1) the debtor must have had an ownership interest in the property before the lien attached; and (2) avoidance of the lien must entitle the debtor to a state or federal exemption." *Id.* at 680.

These analyses, applied literally, should easily resolve any questions of a Debtor's election of lien avoidance. But, none of Debtor's prior experiences with Title 11, however, have proved to be "easily resolved." The words of learned Justice Stevens assuage some of Debtor's doubts; however, at least to reassure that the application of §522(f) doesn't require a degree in rocket science. ". . .[F]or purposes of determining whether a lien is avoidable - rather than for the purpose of determining the extent to which the lien should be avoided - the question whether the debtor 'would have been entitled' to an exemption is addressed to the state of affairs that

existed at the time the lien attached." *Owen v. Owen*, 500 U.S. 305, 320 (1991). Perhaps this lien avoidance might be as easy as it appears, after all?

There's no question as to the date of attachment of DOF's liens: For the 1992 Subaru, the DOF's liens attached on the date of impounding by the NYPD[6]; and for the 1997 Subaru, the DOF's liens attached on May 22, 2009, the date of impounding by Marshal Rose. Similarly, there's no question that the Debtor had "an ownership" interest in both vehicles before the liens attached. *Weinstein*'s two requirements are seemingly met.

Applying the three-prong test fashioned by Judge Gerling in *Little*:

Step One - NYD & CL§ 282(1) – permits a debtor's exemption of one (1) motor vehicle,

Step Two - NYD & CL§ 282(1) – a debtor may exempt a vehicle's value up to $2,400, and

Step Three – perform the calculation to determine if the lien actually impairs the exemption.

For purposes of calculating the result of "Step 3", Debtor assumed the 1992 Subaru's value to be as scheduled; i.e. $1,000. As the amount of the DOF's submitted claim/claims range from $3,800.98 to $5,100.10, the Debtor used the lowest of these amounts in the initial calculations as follows:

(i) the amount of the lien - is it $3,800.98 or $ 125.00 (summons 1072465735) ?
(ii) all other liens - $0.00 or $3,495.98 ($3,800.98 - $ 125.00 - $180.00) ?
(iii) amount debtor **could** claim if there were no liens - $2,400.00 .
(iv) the amount the Debtor **would** have claimed but for the liens - $1,000.00.

_____

6. The DOF's lien/liens first "attached" with the marshal's levy and impounding of the 1992 Subaru on December 13, 2005. As the Subaru was returned to Debtor upon presentation of documentation of the pending Chapter 13 proceeding, presumably the City Marshal and DOF would hope to call for a "Do-Over" and "de-levy" its judicial lien, thereby "de-attaching" the DOF's lien. The second time the DOF's lien attached to the 1992 Subaru was upon Marshal Rose's levy and impounding of the vehicle on January 5, 2006. Another Do-Over? The third time January 24/25, and the fourth time approx March 1, 2006. More Do-Overs? No Harm, No Foul? Not very likely.

Applying the Avoidance Formula:  Impairment of a Debtor's exemption occurs when (i) + (ii) + (iii) is greater than (iv) where

  (i)   represents the value of the lien that's claimed;

  (ii)  represents the total sum of the values of all other liens on the property;

  (iii) represents the monetary value of the exemption that the debtor **could** claim if there were no liens on the property; and

  (iv) represents the monetary value of the exemption the Debtor **would** have claimed but for the liens.

When the above values are inserted into the simple equation the results are:

$3,800.98 + $0.00 + $2,400.00 = $6,200.98 is greater than $1,000.00  -  **AVOIDANCE!!** or

$125.00 + $3,495.98 + $2,400.00 = $6,020.98 is greater than $1,000.00 - A**VOIDANCE!!** or

$125.00 + $3,370.98 + $1,000.00 = $4,495.98 is greater than $2,400.00 - **AVOIDANCE!!**

Every permutation using the above values results in a determination that the attachment of the DOF's lien/liens impair the Debtor's claim to the exemption of the 1992 Subaru under §522(f).  Further, it appears to make no difference if DOF's lien is a single lien calculated as the sum of all twenty-five (25) claims in judgment (and excludes the two (2) not in judgment), or as twenty-five (25) separate liens.

The above calculations assumed the Subaru's FMV to be $1,000, as reflected on Schedule C filed by Debtor of October 16, 2005 (Chapter 13 case).  Not only was the Debtor's intention to exempt his 1992 Subaru clearly expressed, it was manifested by his filing Schedule C with the Chapter 13 petition.  Admittedly, the Debtor cited the incorrect statutory authority for the exemption, but this is a rather minor matter, and one easily corrected.  The Debtor's entitlement to the exemption as well as Debtor's election to exempt the 1992 Subaru would not be diminished or adversely affected by Debtor's incorrect attribution of a statutory predicate.  To conclude otherwise would abrogate the promised "fresh start" as well as deny the fundamental nature of the bankruptcy court as a court of equity.

In addition, the wrongful impounding and sale of Debtor's 1992 Subaru in March 2006 deprived Debtor of property which Congress and the New York State Legislature determined would facilitate a Debtor's realization of the "fresh start." With a car, debtors can get to their jobs; paychecks would follow; and debtors, once again, can become productive members of society. The wrongful acts by City Marshal Rose, NYPD and DOF caused Debtor significant hardship, economic losses and increased expenses as well as emotional distress and anguish.

Debtor purchased the 1997 Subaru with the specific intention to replace the 1992 Subaru which was wrongfully impounded and sold by the wrongful acts of City Marshal Rose, NYPD and DOF. Debtor contends that his right to exempt "a motor vehicle" extends to 1997 Subaru that Debtor purchased in December 2008 as a replacement for the 1992 Subaru. The substitution of the value of $1,500 in the "Avoidance Formula" for the amount of exemption Debtor **would** have claimed, in place of $1,000 representing the 1992 Subaru's FMV on the filing date, has no effect on the calculation to determine the impairment of a claimed exemption by a creditor's judicial lien.

The Debtor's argument for the extension of the property exemption of a motor vehicle flows and extends to the replacement of one which has been previously exempted by a debtor is supported by the common knowledge that cars break down. If a claimed exemption does not extend to its replacement, the replacement vehicle would be subject to levy by any creditor holding a judgment, thwarting Congress' legislative efforts to ensure a debtor of a four-wheeled fresh start.

Further, as the 9th Circuit held in *Culver, LLC v. Ciu (In re Ciu),* 266 B.R. 743, 751 (9th Cir. BAP 2001) *aff'd* 304 F.3d 905 (9th Cir. 2002: "Exemptions . . . are determined on the date of the bankruptcy and **without reference to subsequent changes in the character** or value of the exempt property." (emphasis added).

Debtor's email dated November 26, 2008 to Gary Fernbach, attached hereto as **Exhibit J**, documents the 1997 Subaru's purchase price of $1,500. As "fair market value" is determined by the agreement of a willing seller and a willing buyer, Debtor submits that the FMV of the 1997 Subaru was $1,500 in November 2008.

The conversion of the Debtor's Chapter 13 petition to one governed by the provisions of Chapter 7, by the order of Judge Drain on March 9, 2006, adds yet another level of complication to the analysis whether Debtor can avoid the judicial lien of the DOF levied upon the Debtor's 1997 Subaru in May 2009.  When a debtor files for bankruptcy, all of debtor's property becomes property of the bankruptcy estate.  *Taylor v. Freeland & Kronz*, 503 U.S. 638, 642 (1992).  At a minimum, even property which will eventually be exempt remains part of the estate for 30 days past the first meeting of creditors.[7] *Fed. R. Bankr. P. 4003.*

Upon the conversion to Chapter 7, the determination of estate property is controlled by §348(f) which provides, in pertinent part:

> (f) (1) Except as provided in paragraph (2), when a case under chapter 13 of this title is converted to a case under another chapter under this title--

> (A) property of the estate in the converted case shall consist of property of the estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion;

> .  .  .  .

> (2) If the debtor converts a case under chapter 13 of this title to a case under another chapter under this title in bad faith, the property of the estate in the converted case shall consist of the property of the estate as of the date of conversion.

The provisions of subsection (2) do not apply as the conversion was upon the Court's own motion and was actually contested by Debtor.   The Debtor argues that the conditional phrase "that remains in the possession of or is under the control of the debtor on the date of conversion" excludes from the Chapter 7 estate all property

_____

7.  The First Meeting of Creditors of the Chapter 13 proceeding was held on January 19, 2006, and was adjourned to February 9, 2006.

   The "first" First Meeting of Creditors in the Chapter 7 proceeding was held on April 17, 2006, but was not concluded at that time.  The Chapter 7 Trustee continued or adjourned each subsequent date scheduled to reconvene the Creditors' Meeting until such time as the Trustee either forgot about or lost interest in reconvening the meeting.  At a hearing in February 2007, Debtor believes Judge Drain determined that the Creditors' Meeting had been "concluded," but Debtor is not certain whether a specific end-date was determined by Judge Drain at that time.

properly withdrawn from the Debtor's Chapter 13 bankruptcy estate as it was constituted on the date of the filing of the Chapter 13 petition (i.e. October 16, 2005). Subsection (f)(1) presumes that the property of the estate of the converted case may not be the same as, and likely will be less than (i.e. "*remains* in the possession of") the property of the Chapter 13 estate. Property acquired by Debtor in the period after the Chapter 13's filing and the date of the conversion is also excluded from the Chapter 7 estate.

Assuming the Court accepts Debtor's contentions that Schedule C as filed on October 16, 2005, adequately established Debtor's election for the exemption of the 1992 Subaru pursuant to NYD & CL§ 282(1), and Debtor's exemption extends to the 1997 Subaru purchased in replacement of the 1992 Subaru, is the DOF's judicial lien avoidable pursuant to §522(f)?

Here, again, the application of Judge Gerling's three-step analysis easily demonstrates that DOF's lien impermissibly impairs the property exemption to which Debtor is allowed.  Debtor may, therefore, avoid the DOF's lien and Marshal Rose's levy and impounding of Defendant's 1997 Subaru.  As there is no basis for the withholding of the Subaru from Debtor, this Court should order the Department of Finance and Marshal Rose to return the said vehicle to Debtor without delay.

## Permissive Amendments and Rule 1009

Lastly, In the event that this Court should determine that Debtor's exemption of a motor vehicle, either one or both, have not been properly claimed and set forth on Schedule C, the Debtor asserts that this minor ministerial act, which is readily cured by a simple document filing, should not have any significant effect upon the determination by this Court of any issue raised herein.  The Debtor hereby requests that he be permitted an opportunity to file a formal amendment of schedules to claim the exemption.  Notice of any amendment of Schedule C by Debtor is required to be provided to all parties and creditors under the Bankruptcy Rules of Procedure; however, the amendment will not reopen the objection period as to assets already claimed as exempt.  *In re Hickman,* 157 B.R. 336 (Bankr. N.D. Ohio, 1993).

Federal Rule of Bankruptcy Procedure 1009 provides, in pertinent part:

(a)  General right to amend.
A voluntary petition . . . {or]  . . . schedule . . . may be amended
by the debtor as a matter of course at any time before the case is
closed."

The Notes of the 1983 Advisory Committee on Rules offer further
understanding of the Committee's intention to permit the widest possible latitude
for a debtor's amendment prior to the close of the case.

"This rule continues the permissive approach adopted by former
Bankruptcy Rule 110 to amendments of voluntary petitions and
accompanying papers. Notice of any amendment is required to
be given to the trustee. This is particularly important with
respect to any amendment of the schedule of property affecting
the debtor's claim of exemptions.

This "permissive approach," allowing amendment at any time before the case is
closed and denying courts discretion to reject amendments, has been endorsed in most
circuits. *See In re Gershenbaum,* 598 F.2d 779 (3d Cir.1979),  *Shirkey v. Leake*, 715
F.2d 859, 863 (4th Cir.1983),  *Stinson v. Williamson*, 804 F.2d 1355 (5th Cir. 1986),
*Lucius v. McLemore*, 741 F.2d 125 (6th Cir. 1984), *In re Yonikus,* 996 F. 2d 866 (7th
Cir. 1993),   *In re Andermahr*, 30 B.R. 532 (Bankr. 9th Cir.1983),  *and  In re Doan,* 672
F.2d 831, 833 (11th Cir.1982).

Leave to file an amended schedule is properly denied where the court
determines that the amendment is sought in "bad faith." Michael A. Cardozo, Esq.,
Corporation Counsel for the City of New York, attorney for the Department of
Finance has previously argued:

"This Court has already noted the extent to which Debtor has abused
the bankruptcy process and attempted to "play games with schedules.
*See* Hr'g Tr. Dated Jan. 10, 2007 at 11 [Docket No. 115}. The instant
Motion is baseless in law and in fact and further illustrates why the
Debtor's continued abuse of the bankruptcy process must not be
allowed to proceed unchecked." *See* Response of the Department of
Finance," Docket No.262, para. 23.

Whether this Court is comfortable with third parties using words they've found
in a transcript of a motions hearing the third parties did not attend to slander the
Debtor and accuse Debtor of criminal conduct punishable by fine and imprisonment

will become clear during the hearing to be held on this motion.  Let there be no further doubt, however, that Debtor **will not** sit idly and allow Mr. Cardozo or anyone else to slander him.  Debtor demands that Michael Cardozo, Esq. personally appear at the hearing to be held on this Motion and substantiate the slanderous allegations previously made against Debtor including, but not limited to: Debtor has "abused" the bankruptcy system; Debtor has knowingly made statements to the Court which were "disingenuous"; Debtor's "misrepresentation to Finance."

Wide latitude is justly permitted to litigants and witnesses to ensure their statements made in court (or in papers submitted) permit the "trier of fact," whether judge or jury, will hear and determine "the whole truth."  One should not fear reprisal for accidentally misspeaking or innocently exaggerating a point for emphasis. Attorneys, so they can diligently represent and advocate on their clients' behalf, enjoy a qualified immunity shielding them from liability for the words they choose and statements made.  No immunity exists, however, for slanderous comments made for the sole purpose of exacting strategic advantage in litigation where the proponent of the slanderous comments, in reckless disregard of their truth or falsity attempts to hide beneath the skirt of the feeble excuse of merely reiterating "something they've read."

WHEREFORE, in consideration of the foregoing, Debtor moves this Court

1.  Debtor moves the Bankruptcy Court for a finding and Order that the impounding of Debtor's 1982 Subaru by NYPD and City Marshal Rose and the DOF on December 13, 2005, January 6, 2006, January 24/25, 2006 and on or about March 1, 2006 violated the automatic stay provided by §362(a) and a determination of Debtor's damages as the result of said violation, including punitive damages.

2.  Debtor moves the Bankruptcy Court for a finding and Order that the sale by the NYPD of Debtor's 1982 Subaru on March 22, 2006 violated the automatic stay provided by §362(a) and a determination of Debtor's damages as the result of said violation, including punitive damages.

3.  Debtor moves the Bankruptcy Court for a finding and Order that the claims of the DOF for "parking fines and penalties" are not exempted by §523(a)(7). And, further, Debtor moves the Bankruptcy Court for a finding and Order that any and all claims of the DOF against the Debtor for parking fines and penalties which predate the

date of the Chapter 7 conversion were discharged by the Bankruptcy Court's grant of discharge to Debtor on May 9, 2009.

4  Debtor moves the Bankruptcy Court for a finding and Order that the May 22, 2009 impounding and retention of Debtor's 1987 Subaru by Marshal Rose and the DOF violated the discharge injunction provided by §727(b) and §524 and a determination of damages sustained by Debtor as the result, including punitive damages.

5. Debtor moves the Bankruptcy Court  pursuant to §522(b) to avoid any and all liens as they impaired the exemptions claimed by Debtor pursuant to New York Debtor and Creditor Law ("NYD & CL") §282 for a motor vehicle.

6. As the issues raised in this matter by Debtor unfold in subsequent pleadings and motions hearings, and the Debtor or this Court find that the Debtor's entitlement to an exemption of the 1997 motor vehicle would be best preserved and/or presented by the amendment of Schedule C, Debtor seeks this Court's leave to file an amendment of his previously filed Schedule C  "Property Claimed as Exempt" to include his previously scheduled 1992 Subaru as well as the 1997 Subaru, which Debtor bought in replacement thereof.

7. Such other and additional relief as the nature of this case may require, and which to this Court shall appear just and proper.


I HEREBY CERTIFY, under the penalties of perjury, the foregoing statements are true and correct to the best of my knowledge and belief.

Respectfully Submitted,


_/s/_____
William C. Bace, Debtor pro se
31 East 30th Street, Apt A
New York  NY  10016
917.  388.  2278
nyce30@gmail.com

**Certificate of Service**

I hereby certify that on September 9, 2009, a copy of the foregoing Motion was provided to the persons listed below in the manner stated:

United States Trustee, 33 Whitehall Street, Suite 2200, New York NY 10004, via first class mail;

Roy Babitt, Esq., Chapter 7 Trustee, c/o Jeffrey D. Vanacore, Esq., Arent Fox, LP, 1675 Broadway, New York  NY 10019 via first class mail and email: Vanacore.Jeffrey@arentfox.com;

Joshua M. Wolf, Esq., Corporation Counsel for the City of New York, Attorney for Department of Finance, New York City Law Department, Office of the Corporation Counsel, 100 Church Street, 5th Floor, Room 5-199, New York, New York 10007, via first class mail and email: jowolf@law.nyc.gov;

City Marshal Jeffrey S. Rose, Marshal for the City of New York, 5801 Avenue N, Brooklyn NY 11234, via fist class mail; and

NYPD, c/o Legal Department, One Police Plaza, New York NY 10038, via first class mail.


_/s/_____
William C. Bace, Debtor pro se